69 Wis.2d 387 (1975)
230 N.W.2d 651
METROPOLITAN SEWERAGE DISTRICT OF THE COUNTY OF MILWAUKEE, acting by and through the Sewerage Commission of the City of Milwaukee, Appellant,
v.
CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Respondent.
METROPOLITAN SEWERAGE DISTRICT OF THE COUNTY OF MILWAUKEE, acting by and through the Sewerage Commission of the City of Milwaukee, Respondent,
v.
CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Appellant.
Nos. 495, 517.
Supreme Court of Wisconsin.
Argued June 2, 1975.
Decided June 30, 1975.
*390 For the appellant there were briefs by Schroeder, Gedlen, Riester & Moerke, Ewald L. Moerke, Jr. and *391 Robert Arthur Melin, all of Milwaukee, and oral argument by Ewald L. Moerke, Jr.
For the respondent there was a brief by Godfrey & Trump, attorneys, and Richard R. Robinson of counsel, all of Milwaukee, and oral argument by Mr. Robinson.
Case No. 517:
For the appellant there were briefs by Godfrey & Trump, attorneys, and Richard R. Robinson of counsel, all of Milwaukee, and oral argument by Mr. Robinson.
For the respondent there was a brief by Schroeder, Gedlen, Riester & Moerke, Ewald L. Moerke, Jr. and Robert Arthur Melin, all of Milwaukee, and oral argument by Ewald L. Moerke, Jr.
BEILFUSS, J.
One of the significant factual differences in the two cases is that the new bridge was relocated and built about 100 feet from the old one in the KK River project, and the new bridge in the Lincoln Creek project was rebuilt at the same location as the old bridge.
In 1895 the railroad constructed a bridge across the southeastern branch of the KK River in the city of Milwaukee to carry the railroad's main line of tracks between Chicago and Milwaukee. In subsequent years the bridge was modified to add increased strength and support more tracks. Railroad records reveal that in 1942 there was an opening of 218 square feet under the bridge, and that when the water was at its highest level it was two feet below the inside top of the bridge.
On June 1, 1956, the railroad was notified by the sewerage commission of the city of Milwaukee (city commission) that it had developed a master plan layout for the improvement of the KK River insofar as drainage was concerned, which involved the straightening of its course and the removal of several bends. The railroad was further advised that as a consequence of such straightening, the point at which the river and the *392 tracks intersect would have to be relocated about 100 feet south of the original bridge. The railroad refused to pay for the cost of the new bridge or culvert, but in recognition of the fact that litigation of the question of who should pay for the new bridge would take considerable time, the railroad and the sewerage commission, acting for the benefit of the Metropolitan Sewerage District, on September 29, 1959, entered into a written agreement whereby the railroad agreed to grant an easement through its right-of-way to the district and to construct a temporary bridge under which the new one could be constructed. The city commission agreed to construct or have constructed the permanent new bridge and to advance funds for the entire project, including the work done by the railroad, out of district funds. The agreement further provided that the payment of such funds would in no way prejudice the rights of the district or the city commission to commence an action to determine the respective rights or obligations of the parties to pay for the work contemplated by the agreement. The agreement was specifically made in recognition of the fact that any delay in the completion of the work due to litigation would not be in the public interest.
The contract for the new bridge was awarded on May 19, 1960, and the project was completed on December 19, 1960.
The design of the structure was selected by the city commission from three alternative plans submitted by the railroad based on specifications furnished by the city commission. The new bridge or culvert has a potential 280-square foot opening, but at the time of trial the river bed under the structure had not been fully excavated so that there was only about 140-square feet actually open.
The master plan for the river, which included straightening, deepening and widening, was designed and executed *393 in the public interest to alleviate a severe flooding problem created by increasing urbanization and resulting imperviousness and surface water runoff. Such flooding, in addition to affecting road and airport conditions, was surcharging the sanitary sewers, causing them to back up, sometimes into basements, creating a health hazard.
The district commenced this action on June 3, 1969, by service of a summons and complaint in which it alleged, inter alia, the expenditure of $226,100.88 on the project. In its answer, the railroad admitted the amount of such expenditure but denied liability for such amount.
Subsequent to a trial to the court, the circuit court held that the railroad was under no statutory or common-law duty to pay for the construction of the new structure and dismissed the complaint. Such holding was based on findings that: (1) The relocation of the bridge, although prompted by reasons of public necessity, was of no benefit to the railroad; (2) the old bridge remained entirely serviceable and had a larger effective opening than the new bridge; and (3) the railroad did nothing to change the course of the channel.
In 1863 the railroad constructed a triple arch culvert or bridge to carry one of its main-line tracks across Lincoln Creek. The structure measured 12 feet from the bottom of the channel and was constructed of stone piers, abutments and head rolls, with brick arch rings. The bridge was 15-feet wide and 38-feet long (across the creek). Its waterway opening measured 470-square feet.
In 1934, in connection with other creek improvements, the flow line of the creek under the bridge was lowered four to five feet and the bridge's piers were encased in concrete, all at public expense and not for any railroad purpose. As a result of such alterations the waterway opening under the bridge became 523-square feet.
In 1937, to increase the structural strength of the bridge, the railroad installed large timber struts in the *394 center arch of the bridge. By 1964 the railroad had installed such struts or cribbing at the top and sides of all three arches. Because of the space occupied by such timber cribbing, in 1964 the waterway opening under the bridge had been reduced to 292-square feet.
In 1961 the railroad was advised by the city commission that it had developed an improvement plan for Lincoln Creek which would necessitate deepening the channel five and one-half feet under the bridge and would require a waterway opening under the bridge of 600-square feet. The improvement plan also involved the widening, deepening, straightening and paving of the channel in several areas along its course. Such improvements were necessary due to heavy flooding which was occurring in the area as a consequence of the growing imperviousness, due to urban development, of the land in the Lincoln Creek watershed. Such flooding, in addition to submerging streets and basements, was overloading, or surcharging, the sanitary sewers, causing them to back up and deposit sewage in residential basements, thereby creating a health hazard.
Because the railroad refused the city commission's request that it reconstruct its bridge to conform with the necessary specifications, the parties entered into an agreement on September 29, 1965, similar to the one involved in the KK River case. In essence, the railroad agreed to demolition and reconstruction of the bridge and the city commission agreed to pay the costs. The agreement further provided, however, that it was:
". . . mutually agreed and understood, however, that the payment of these funds by the Commission or the District shall not in any way, shape or manner prejudice the rights of the District or the Commission from instituting such action or actions as may be necessary to determine the rights or obligations of the parties to this contract to pay for any part or all of the work set forth in the contract to be done by either or both of the parties, nor shall it prejudice the rights of the railroad to defend *395 such action; the understanding between the parties being that the public interest requires the completion of this work, and that any delay due to litigation to determine the respective rights of the parties would not be in the public interest."
The new, open span bridge was installed on August 7, 1966, on the same site as the original.
This action was commenced by service of summons and complaint on July 25, 1969, by the district acting by and through the city commission. The complaint alleges a statutory and common-law duty on the part of the railroad to pay for the new bridge and demands recovery in the amount of $194,323.09. The railroad, in its answer, admits that amount to be the cost of reconstruction.
At the trial, the division engineer for sewer design of the city commission testified that the effect of the timber cribbing was twofold: (1) It reduced the waterway area under the bridge, and (2) it snagged floating brush and debris during high-water periods, thereby creating a damming effect. He also testified that without the cribbing the waterway opening would have been sufficiently large and that, depending upon the structural stability of the bridge, it may have been possible to remove the timber. He further testified that the city commission had tried to devise a suitable plan to alleviate the flooding that would not require the reconstruction of the bridge, but was unable to discover any satisfactory alternative.
Professor Arno T. Lenz of the University of Wisconsin College of Engineering likewise testified to the twofold effect of the old bridge's cribbing, which seriously restricted the ability of the channel to carry water under the bridge.
Mr. Gary U. Mentjes, a civil engineer employed by the railroad, testified that if the timber cribbing had been removed from the old bridge and concrete reinforcements installed instead, the waterway opening would have been *396 445-square feet. He was unsure whether this could have been safely accomplished however, but testified that the bridge would have had to have been replaced anyway because the required channel excavation would have gone below the footings of the old bridge.
The trial court found, inter alia, that the old bridge "with its lumber cribbing, was detrimental to the flow of the channel as improved," and "would substantially affect the water flow up stream." It also found that, "The Lincoln Creek improvements are necessary to control the flood problem," and concluded that the railroad was under a statutory and common-law duty to pay for the cost of the new bridge.
In both cases the railroad takes the position that the sewerage commission of the city of Milwaukee did not have legal authority to order the improvements in the respective watercourses.
The city commission was created under the provisions of ch. 608, Laws of 1913. Secs. 5 and 7 of the act spell out the general function of the city commission:
"SECTION 5. Said commission shall be charged with the duty of projecting, planning, constructing and establishing a sewerage system for the collection, transmission and disposal of the house and other sewage and drainage of . . . [Milwaukee], including, either as a combined or separate feature of said system, the collection, transmission and disposal of storm and ground-water, respectively, and shall be clothed with every and all powers which may be necessary or proper for those purposes, or either of them . . ."
"SECTION 7. All individuals and corporations lawfully having buildings, structures, works, conduits, mains, pipes, tracks, or other physical obstructions, in, over, or under the public lands, avenues, streets, alleys, or highways of any such city which shall block or impede the progress of such sewerage system when in process of construction and establishment, shall, upon reasonable notice from said commission, promptly so shift, adjust, accommodate or remove the same, at the cost and expense *397 of such individual and corporation, as fully to meet the exigencies occasioning such notice . . . ."
The Metropolitan Sewerage District of Milwaukee County was created by ch. 554, Laws of 1921, which became sec. 59.96, Stats. Generally, the law created the district, composed of the city of Milwaukee and all the land in Milwaukee county which was in the same watershed as the city of Milwaukee. The law also created the Metropolitan Sewerage Commission (metro commission), the function of which, as stated in sec. 59.96 (6) (a), Stats. 1957, was to:
". . . in its discretion project, plan, construct, and maintain in such county outside of the city limits of such city of the first class but within the same drainage area, main sewers, pumping and temporary disposal works and other plants for the collection and transmission of house, industrial and other sanitary sewage to and into the intercepting sewerage system of such city of the first class, and may improve water courses (including the building of storm sewers) needed for the purpose of preventing surcharging of the sewer system and do such other work that may be necessary in connection therewith." See generally, Thielen v. Metropolitan Sewerage Comm. (1922), 178 Wis. 34, 189 N. W. 484.
The above paragraph was amended by ch. 385, Laws of 1959, effective September 6, 1959, to provide, as in the current sec. 59.96 (6) (a), Stats., that the metro commission:
". . . may improve any watercourse within the district by deepening and widening or otherwise changing the same where in the judgment of the commission it may be necessary in order to carry off surface or drainage water . . . ."
It is the contention of the railroad on this appeal that the city commission is without authority to improve watercourses, and that prior to September 6, 1959, the district was without authority to do so within the city *398 of Milwaukee, where the southeastern branch of the KK River is located. Since the record indicates that the metro commission resolved to undertake the project prior to that date,[1] the railroad argues that there was never authorization to proceed with the river project.
The district, on the other hand, argues that ch. 608, Laws of 1913, contains an implied grant of authority to the city commission to proceed with the river project because the KK River is an essential component of the city's sewerage system. In support of this position, the district points to the testimony indicating that inadequate drainage of surface water was causing surcharging and backing up of sanitary sewers and creating health hazards due to the raw sewage being discharged into basements.
In our opinion, ch. 608, Laws of 1913 is broad enough to authorize the river improvement project undertaken in these cases.
*399 As pointed out above, ch. 608, Laws of 1913, clothes the city commission with "every and all powers which may be necessary or proper" for the establishment, and presumably maintenance, of a sewerage system, "including, either as a combined or separate feature of said system, the collection, transmission and disposal of storm and ground-water." We believe that this legislative grant of authority is alone sufficiently broad to encompass the projects. The act, however, also contains specific grants of authority which do not limit the general grant referred to above. One of the specific grants, sec. 5 (d), provides that the city commission shall be empowered to:
". . . create or use, or create and use all such instrumentalities and means within any such city . . . including submerged as well as other lands, as it may deem expedient or necessary for carrying said system of sewerage . . . into full effect. . . ."
In light of the expert testimony indicating the KK River to be an essential component in the sewerage and drainage systems of the area, we conclude that ch. 608, sec. 5, Laws of 1913, does provide authorization for the projects, including the alteration of watercourses.
With respect to sec. 59.96 (6) (a), Stats., it must be noted that the 1957 version, while limiting the projection, planning, construction and maintenance of sewers, pumping and temporary disposal works and other plants to areas in the district outside of the city of Milwaukee, there is no such restriction as to the improvement of watercourses, the statute in fact providing that while *400 the former work may be conducted only outside the city, the metro commission may improve any watercourse to prevent surcharging of the sewer system within the city.
A problem with this interpretation, however, arises under sec. 59.96 (6) (1), Stats. 1957, which provides that:
"The powers of the commission [metro] shall not extend to or apply to the territory of any city of the first class which may be constructing, building and operating its sewerage system under a commission provided by law."[2]
Thus it would seem that because the city commission is in operation, the metro commission cannot act. Hence the authority to act must reside in the city commission. As stated above, we believe the city commission does have such authority. To hold otherwise would be to ascribe to the legislature an intent to severely handicap the city commission in its attempt to effectively deal with its sewerage problem. In view of the broad language used in ch. 608, Laws of 1913, such intent cannot fairly be implied. The absence of any power in the district to operate within a city of the first class, when such city is "operating its sewerage system under a commission provided by law," indicates that such power resides in the city commission. As stated in State ex rel. Arnold v. County Court (1971), 51 Wis. 2d 434, 439, 440, 187 N. W. 2d 354:
"In considering a statute, the court must seek the legislative intent as disclosed from the language of the *401 statute in relation to its scope, history, context, subject matter, and object intended to be remedied or accomplished. [Case cited.]" See also: City of Milwaukee v. Milwaukee County (1965), 27 Wis. 2d 53, 56, 133 N. W. 2d 393.
The district contends that the railroad is estopped from contesting the authority of the city commission to undertake the river improvement project by virtue of the written agreement. The district argues that if the railroad can convince the court that no such authority existed, it "could oust the appellant from the land." It is further argued that, "If there was any question in the mind of the Railroad officials as to ... authority, then they should not have signed the agreement."
An examination of the agreement dispels these contentions. The easement granted to the district by the railroad in the KK project is in no way made contingent on any finding of authority in the city commission. More importantly, the portion of the agreement reserving the rights to sue and defend does not limit the grounds upon which such defense may be made. In fact, the broad language of the agreement compels the opposite conclusion:
"It is further mutually agreed and understood, however, that the payment of these funds by the Sewerage Commission of the City of Milwaukee or the Metropolitan Sewerage District shall not in any way, shape or manner prejudice the rights of the Metropolitan Sewerage District or the Sewerage Commission of the City of Milwaukee from instituting such action or actions as may be necessary to determine the rights or obligations of the parties to this contract to pay for any part or all of the work set forth in this contract to be done by either or both of the parties or the rights of the railroad to defend such action; the understanding between the parties being that the public interest requires the completion of this work and that any delay due to litigation to determine the respective rights of the parties would not be in the public interest."
*402 The language of the agreement could not induce a justifiable reliance by the district that the railroad would restrict its defense of a subsequent lawsuit by not raising the question of authority to proceed with the river project. In any event, we have determined the district did have statutory authority to plan and carry out the project.
Based upon our construction of the statute, the stipulation of the parties and findings of the trial court that the projects were necessary, we conclude the commission had authority to plan and adopt the agreed plans and to go ahead with the construction as a part of the plan, and construction of the two new bridges under consideration here had to be built to adequately accommodate the sewerage problem and provide the railroad with an adequate crossing over the streams. The railroad actively participated in planning of suitable bridges or culverts.
The principal question is who is financially liable for the cost of the construction of these bridges and culverts and the incidental expense in connection therewith. The cost of the KK River bridge was $226,100.88, and the cost of the Lincoln Creek bridge was $194,323.09.[3] The district paid for these bridges and then commenced these actions. As stated above, the trial court concluded the district was financially liable for the KK bridge and the railroad liable for the Lincoln Creek bridge. Upon these appeals both parties claim the other is financially responsible for both projects.
The statutory provision relied on by both parties is sec. 190.08, Stats., of the chapter entitled, "Railroads: Organization and Management." The section provides in part:
"Streams, highways, restored. Every corporation constructing, owning or operating a railroad shall restore every watercourse, street, highway, road or canal across, *403 along or upon which such railroad may be constructed to its former state or to such condition that its usefulness shall not be materially impaired and thereafter maintain the same in such condition against any effects in any manner produced by such railroad . . . ."
The district, relying on cases from other jurisdictions[4] interpreting similar statutes, contends that sec. 190.08, Stats., requires the railroad, at its own expense, to construct a new bridge or culvert when the course of the river over which its old one is built is artificially changed to improve drainage. The railroad, in an attempt to distinguish those cases, emphasizes the particular idiosyncrasies of the foreign statutes which allegedly require conclusions different than should obtain under sec. 190.08.[5]
We believe that resort to other courts' interpretations of other jurisdictions' statutes is unnecessary in view of this court's decision in Chicago, Milwaukee & St. Paul Ry. Co. v. Milwaukee (1897), 97 Wis. 418, 433, 434, 72 N. W. 1118. In that case a railroad sought compensation from the city of Milwaukee for expenses incurred in the construction of a grade crossing when the city decided to extend a public street across the railroad's tracks. In construing the predecessor of the current sec. 190.08, Stats., the court stated:
"Sec. 1836, R. S., provides that `every corporation constructing, owning or using a railroad, shall restore *404 every . . . street, highway, . . . across, along or upon which such railroad may be constructed, to its former state, or to such condition as that its usefulness shall not be materially impaired, and thereafter maintain the same in such condition against any effects in any manner produced by such railroad.' The word `restore' relates to something having a previous existence, and the same is true of the words, `across, along or upon which such railroad may be constructed.' That appears to be quite conclusive. The effect of this is to divide, somewhat, highway crossings into two classes; one where the responsibility for their maintenance, as between the railway company and the municipality within which they are located, is on the former, and the other where such duty is on the latter, which is unfortunate and contrary to the general legislative policy. But we cannot do violence to the plain language of the statute, even to effect an obvious legislative policy. The contrary construction of a similar statute in Indiana (Louisville, N. A. & C. R. Co. v. Smith, 91 Ind. 119) does not appear to us to be sound."
We find no persuasive reason such interpretation should not be adhered to in the KK River case. Sec. 190.08, Stats., requires a railroad to "restore" and "thereafter maintain." Such language clearly creates a duty only to return a watercourse, street, etc., to a condition of usefulness. It cannot be construed as to require a railroad to provide for subsequently constructed watercourses or streets. Furthermore, the duty to maintain extends only as "against any effects in any manner produced by such railroad." The record in the KK River case is uncontroverted to the effect that the conditions militating in favor of the river improvement project were in no way produced by the railroad. Therefore, we conclude sec. 190.08 does not require the railroad to pay for the new bridge or culvert in the KK River case.
With respect to any common-law duty of the railroad to pay, we again believe that existing Wisconsin case law is controlling. In Chicago, Milwaukee & St. Paul Ry. Co. v. Milwaukee, supra, this court considered whether a *405 railroad, required to construct a grade crossing to accommodate the extension of a public street across its tracks, could recover the cost of planking the crossing. The court noted that the general rule was that the railroad should be required to pay for every aspect of the grade crossing required by the police power. The court also recognized, at page 432, that:
". . . the weight of modern authority is . . . to the effect that everything that goes to make up a crossing, safe for public use, is as essentially within police regulations as any part of it. There is no good reason for singling out planking of the tracks from other essentials of a safe crossing, and saying that it is a mere structural change of the track and not a requirement for public safety. . . ."
However, in view of the court's interpretation of sec. 190.08's forerunner, set out above, it concluded, at page 436, that the cost of such planking was properly awarded to the railroad:
". . . for necessary structural changes in plaintiff's property, not required under any police regulation, but necessary to make such property conform to the new use, yet be properly protected and adapted for the old use."
Likewise in the KK River case, the construction of the new bridge was necessary not to promote any public interest or pursuant to any police power, for the river project could have proceeded without a bridge spanning its new channel, but rather such construction was undertaken to restore the railroad to its prior position. In other words, the construction of the bridge was "necessary to make such property conform to the new use, yet be properly protected and adapted for the old use."
The district relies on Lemonweir River Drainage Dist. v. Chicago, M., St. P. & P. RR. Co. (1929), 199 Wis. 46, 49, 50, 225 N. W. 132, for the proposition that it is:
*406 ". . . the common-law rule that a railroad company crossing with its roadbed a natural watercourse is bound to construct its roadbed so as not to materially interfere with the natural flow of such watercourse; and further, that such duty is not a once-and-for-all duty and forever discharged by a proper original construction over such stream, but is a continuing one, and such railroad must adjust such construction thereafter and, in the absence of statute to the contrary, at its own expense, to meet changes in the condition of such watercourse arising, either from natural causes, or by reason of any lawful enlargement of the flow in the same because of constructions such as are here in question. This must especially be so where the railway company is a party to the original drainage proceedings as it was here."
In the KK River case, unlike Lemonweir, where an existing channel was simply made deeper, there is much more than a mere "enlargement of the flow" involved. We conclude the Lemonweir rule does not contemplate the digging of an entirely new watercourse requiring the abandonment of an adequately large bridge and the construction of a new one some 100 feet away.
With respect to the question of public policy, Winston-Salem v. RR. (1958), 248 N. C. 637, 650-652, 105 S. E. 2d 37, is helpful:
"While numerous decisions hold that a railroad company may not be relieved of the expense of making crossing improvements because it will derive no benefit from the improvement, nevertheless, in most of the cases cited by the City it is manifest that the company stood to benefit substantially from the overpass, underpass, or other improvement required to be constructed. The benefits accruing to the railroads came in the form of minimized crossing accidents and reduced tort liability of the companies. The improvements also facilitated faster movement of trains and shifting operations in congested areas. See Durham v. R.R., supra (185 N. C. 240); Erie R. R. v. Board of Utilities Commissioners, supra (254 U. S. 394, 65 L. Ed. 322).
"True, in some of the cases there was no direct benefit to the railroad from the crossing improvements, as in *407 Cincinnati, I. & W. R. Co. v. Connersville (1910), 218 U. S. 336, 343, 344, 54 L. Ed. 1060, 1064, 1065, 31 S. Ct. Rep. 93, where the railroad was required to build a trestle to accommodate the opening of a new street through its roadbed embankment. However, in this and other like cases decided or based on precedents established during the earlier days of railroading, before the development of our present State and Federal systems of improved highways, when vehicular traffic operated within short distance limits and served as important feeders for the railroad companies, the railroads shared substantially with the general public in the benefits of improved crossing facilities, in that the improved facilities tended to speed up the movement of vehicular traffic as feeders for the rails. Moreover, since practically all common carrier freight and passenger traffic moved by rail, the costs of these crossing improvements, under sanction of the regulatory agencies, were built into the rate structures and were passed on, first to the shipping public, and then to the ultimate consumers of the products moving by rail. And since these built-in costs were susceptible of being passed on to the ultimate consumers so effectively, the imposition upon the railroad companies of the financial burdens of making crossing improvements comported entirely with basic principles of fairness, and were conceived to impose no undue burdens upon the railroad companies.
"But conditions have changed. . . .
"Under the ordinary competitive conditions now prevailing between the rails and motor transport where, as here, the railroad company derives no direct benefit from the proposed crossing improvement, the imposition on the company of the costs of the project may not ordinarily be justified to any degree on the theory that the costs will be absorbed in the rate structure and passed on to the general public. This is so because rail rates, like other competitive price structures, are subject now in a real sense to the economic law of diminishing returns. And by reason of prevailing conditions under which the rails are in a losing competitive fight for business with other modes of transportation, the costs of crossing improvements may not be built into the rate structures and passed on effectively to the shipping public as in former times. Besides, and assuming *408 arguendo that the costs of these improvements might still in some instances be absorbed in railroad rate structures and passed on to the ultimate consumers, even so, there would be an element of basic unfairness in such process where, as here, the company stands to receive no direct benefit from the project, since the costs would fall only on consumers of goods and on passengers moving by rail, in exoneration of the vast volume of commodities and passengers moving by motor and other competitive modes of transportation."
While not entirely apposite to the facts of the KK River case, the above quotation illustrates the inequity of requiring the railroad to pay for the construction of the new bridge. It derives no benefit from the new bridge or the improved drainage of the area. Its prior bridge was in satisfactory condition and in no way contributed to the situation requiring its abandonment. It is our opinion the cost of the new culvert is the responsibility of the district.
With respect to the Lincoln Creek case, both parties again rely on sec. 190.08, Stats. The railroad argues that this statute is inapplicable because it first became effective in April, 1872 (ch. 119, Laws of 1872), about nine years after the original bridge was constructed. Hence, contends the railroad, the statute cannot be retroactively applied to the case at bar.
This argument cannot be accepted. First, it overlooks the consistent judicial interpretation of the statute by this court. In Roberts v. Chicago & Northwestern Ry. Co. (1874), 35 Wis. 679; Oconto v. Chicago & Northwestern Ry. Co. (1878), 44 Wis. 231; Racine v. Chicago & Northwestern Ry. Co. (1896), 92 Wis. 118, 65 N. W. 857; and Janesville v. Chicago & N. W. Ry. Co. (1951), 258 Wis. 547, 46 N. W. 2d 847, this court applied the statute to situations wherein the railroad structures had been constructed prior to the effective date of the act.
Furthermore, as stated in 82 C. J. S., Statutes, p. 980, sec. 412:
*409 ". . . a statute does not operate retroactively merely because it relates to antecedent events, or because part of the requisites of its action is drawn from time antecedent to its passing, but is retroactive only when it is applied to rights acquired prior to its enactment." See also: 73 Am. Jur. 2d, Statutes, p. 486, sec. 348.
In the Lincoln Creek case, as will be discussed below, the railroad has no right to obstruct the stream at common law, and hence is not deprived of any right.
Finally, with respect to retroactive application, it must be noted that the trial court found, and the evidence clearly shows, that a significant cause of the inadequacy of the bridge was the timber cribbing, which was installed between 1937 and 1964, well after the effective date of the statute.
As to the applicability of the statute in general, the railroad relies on Janesville v. Chicago & N. W. Ry. Co., supra, a case in which a railroad constructed its tracks across a public highway and then built a bridge to carry highway traffic over the tracks. In relating this conduct to sec. 190.08, Stats., this court stated at page 554:
"When defendant's predecessor in constructing the railroad in 1857 traversed the then existing town road by making a deep cut which made it impossible to restore the road to its former state, the railroad performed the second alternative of the statute by restoring the highway `to such condition that its usefulness shall not be materially impaired,' by building the bridge that carried the highway over the deep cut and the railroad tracks; and defendant, in compliance with the provisions in sec. 190.08, Stats., `thereafter maintained the same in such condition against any effects in any manner produced by such railroad' by maintaining the bridge until it burned in 1943. The `effects in any manner produced by such railroad' obviously include the deep cut which was made across this highway in 1857, because of which a bridge for the road became necessary."
The railroad here argues that it satisfied the first alternative of the statute in that it merely allowed Lincoln *410 Creek to continue to flow on its natural course. This rather simplistic argument can be countered by an equally simplistic response: The first "alternative" in the statute requires that the watercourse, etc., be restored to its "former state." Quite obviously, after 1863 Lincoln Creek was no longer in its former state because it had a triple arch culvert or bridge constructed in and over it.
With respect to the second "alternative," requiring the restoration of the watercourse, etc., "to such condition that its usefulness shall not be materially impaired," it seems likewise apparent that such alternative was not satisfied. The creek served an important drainage function which could have been more easily exploited were it not for the existence of the bridge. The obstruction of the creek's flow and of its potential flow was in fact an "effect . . . produced by such railroad," contrary to the mandate of sec. 190.08, Stats.
We conclude, therefore, that such statute does impose a duty on the railroad to pay for the new bridge.
Insofar as any common-law duty is concerned, this court stated in Lemonweir, supra, at pages 49, 50:
"Sec. 89.65, supra, is but a declaration of the common-law rule that a railroad company crossing with its roadbed a natural watercourse is bound to construct its roadbed so as not to materially interfere with the natural flow of such watercourse; and further, that such duty is not a once-and-for-all duty and forever discharged by a proper original construction over such stream, but is a continuing one, and such railroad must adjust such construction thereafter and, in the absence of statute to the contrary, at its own expense, to meet changes in the condition of such watercourse arising, either from natural causes, or by reason of any lawful enlargement of the flow in the same because of constructions such as are here in question. This must especially be so where the railway company is a party to the original drainage proceedings as it was here."
This is a clear statement of the railroad's common-law liability. The railroad contends that the reference to *411 sec. 89.65, Stats. 1929, in Lemonweir, which is substantially the same as the current sec. 88.89, means that the common-law rule required the full panoply of administrative proceedings laid out in ch. 88. An examination of Lemonweir, at page 48, however, reveals that the only portion of the then "sec. 89.65, supra" to which the court was referring as a declaration of the common-law rule, was this abridged version:
"`89.65 Obstructions to flow of water. (1) Whenever any embankment, grade, culvert or bridge . . . built or maintained by any . . . corporation across any natural watercourse or natural draw so obstructs such watercourse or draw that waters therein are set back or diverted upon lands in any district, such . . . corporation shall so enlarge the waterway through such embankment, grade, culvert or bridge . . . that it will not set back or divert such waters upon lands in such district.
"`(2) The commissioners . . . may serve notice upon such . . . corporation to enlarge the waterway through such embankment, grade, bridge or culvert or to make new openings therein sufficient to let the waters pass without flooding such lands.
"`(3) In case the . . . corporation maintaining such embankment, grade, bridge or culvert fails for sixty days after such notice is served to so enlarge . . . the commissioners . . . may report the facts to the court and petition that such owner or maintainer be required to enlarge such waterway.'"
As so stated by the court, it cannot be said that the common-law rule requires an exhaustive administrative procedure. We conclude merely that Lemonweir contains this court's statement of the common-law rule, such that if sec. 190.08, Stats., does not impose liability, the common law does.
It is our conclusion the trial court correctly imposed financial liability in the KK River case upon the district and upon the railroad in the Lincoln Creek case.
The railroad served its answer on the district on July 7, 1969. On July 7, 1972, the railroad filed a motion in *412 the circuit court to allow an amendment to its answer alleging that the action was not commenced within the time limited by sec. 893.19, Stats. The motion was denied by the trial court.
The authority of the trial court to allow or refuse an amendment to the pleadings is derived from sec. 269.44, Stats., which provides:
"Amendments of processes, pleadings and proceedings. The court may, at any stage of any action or special proceeding before or after judgment, in furtherance of justice and upon such terms as may be just, amend any process, pleading or proceeding, notwithstanding it may change the action from one at law to one in equity, or from one on contract to one in tort, or vice versa; provided, the amended pleading states a cause of action arising out of the contract, transaction or occurrence or is connected with the subject of the action upon which the original pleading is based."
Under this section,
". . . Amendments to pleadings are within the discretion of the trial court, and a case will not be reversed on account of the ruling of the court thereon unless there has been a manifest abuse of discretion. Herchelroth v. Mahar (1967), 36 Wis. 2d 140, 153 N. W. 2d 6; Kuester v. Rowlands (1947), 250 Wis. 277, 26 N. W. 2d 639." Celmer v. Quarberg (1973), 56 Wis. 2d 581, 592, 203 N. W. 2d 45.
This rule applies to amendments to include a claim of limitation, and this court has been reluctant to find an abuse of discretion when such motion to amend is denied,[6] especially where, as noted here by the trial court, the facts upon which the defense of limitation is predicated were as equally apparent at the time the original answer was served as at the time the motion *413 to amend was made.[7] Furthermore, the fact that the motion to amend was not made until three years after the original answer was served likewise militates against a finding of abuse of discretion on the part of the trial court. We conclude the trial court did not abuse its discretion in refusing to permit the proposed amendment.
By the Court.Judgments affirmed.
NOTES
[1] "WHEREAS, in connection with watercourse improvement work undertaken by the Sewerage Commission of the City of Milwaukee and the Metropolitan Sewerage Commission of the County of Milwaukee the enlargement of present culverts or bridges, or the construction of new facilities through railroad private property in some cases is necessary; and

"WHEREAS, in requesting said railroad companies to provide the new facilities they refuse to do so stating that under the present law as they understand it, they are under no legal obligation to do so, and construction therefore cannot proceed;
"Now, THEREFORE, BE IT RESOLVED by the Sewerage Commission of the City of Milwaukee and the Metropolitan Sewerage Commission of the County of Milwaukee in joint action, that the Chief Engineer & Gen. Mgr. be and he is authorized and directed to include in the final plans for watercourse improvement work the construction or enlargement of culverts or bridges through railroad private rights of way whenever necessary for projects which have been approved and for which there is urgent need in the interest of public health; and
"BE IT FURTHER RESOLVED that easements and permission for proposed construction work be obtained from the railroad companies involved; and
"BE IT FURTHER RESOLVED that the Legal Advisors of the Commissions be authorized and directed to negotiate with said railroad companies at a later date regarding reimbursement for the aforementioned culvert or bridge enlargement or construction work." Copy of Resolution adopted by the Sewerage Commission of the City of Milwaukee and the Metropolitan Sewerage Commission of the County of Milwaukee, March 5, 1958.
[2] The current sec. 59.96 (6) (1), Stats., as amended by ch. 171, sec. 3, Laws of 1963, restates the former subsection but adds the exception that ". . . the metropolitan sewerage commission may divert waters from watercourses into drains, conduits or storm sewers, may place storm, surface or ground waters therein, may enter into contracts for such purposes and may obtain funds therefor . . . ."
[3] The railroad admits these costs were reasonable.
[4] Chicago, R. I. & G. Ry. Co. v. Tarrant County Water Control Dist. (1934), 123 Texas 432, 73 S. W. 2d 55; Chicago & Erie RR. Co. v. Luddington (1910), 175 Ind. 35, 91 N. E. 939, 93 N. E. 273.
[5] The Texas statute (18 Vernon's Anno., Railroads), art. 6320, is quite similar to sec. 190.08, Stats., except that the former requires the railroad to "keep such crossing in repair," without any limitation, as found in the Wisconsin statute, restricting such duty to "effects in any manner produced by such railroad."

The Indiana statute, sec. 5195, Clause 5, 2 Burns' Anno., Stats. 1908, imposes no duty to repair, or to maintain against effects produced by the railroad.
[6] Plumer v. Clarke (1884), 59 Wis. 646, 18 N. W. 467; Whereatt v. Worth (1900), 108 Wis. 291, 84 N. W. 441.
[7] Rice v. Ashland County (1902), 114 Wis. 130, 134, 89 N. W. 908.