POSNER, Circuit Judge.
 

 This appeal by the State of Iowa in a railroad bankruptcy case requires us to consider the duty (if any) of a railroad which becomes bankrupt and ceases operations to place the highways that cross its abandoned rail lines in the condition they would have been in if there had never been a railroad.
 

 In 1975 the Rock Island Railroad, serving areas in the Midwest, including Iowa, petitioned for reorganization under section 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205 (1976 ed.). In 1980 the district judge presiding over the reorganization proceeding ordered the trustee to liquidate the Rock Island’s railroad operations. The Rock Island is expected to emerge from the proceeding as a going concern — but a going concern in real estate rather than an operating railroad.
 

 The trustee made a contract with a salvage company for the removal of the rails and ties and their sale as scrap, but the contract was explicit that the rails embedded in paved highway crossings would be left in place. Rails on a bridge or underpass would be removed within as well as on each side of the crossing but the bridge or underpass itself would be left in place. The district judge approved the contract in August 1981, after notice and a hearing at which the State of Iowa had objected to the dismantling of some of the rail lines covered by the contract but had not objected to the provision regarding crossings. The salvage operations began in the fall of 1981 (in Iowa as elsewhere) and are continuing, the delay in completing them being due to the fact that the trustee is still trying to sell some lines as operating rail lines. The record contains an estimate of the total revenues that the salvage operations will yield the Rock Island — $31 million — but not of the cost of the operations, so we do not know what their net value will be.
 

 In February 1983 Iowa petitioned the district judge to order the Rock Island to take all steps necessary to put the highway crossings in Iowa in the condition they
 
 *519
 
 would be in if there had never been a railroad. This would mean removing railroad bridges, filling in railroad underpasses, and taking up the rails and repaving the highways at grade crossings. All highway crossings would be affected, whether or not the highway was there before the railroad, provided only that the highway was a state highway rather than a local road. The record does not indicate the number of crossings that would be affected or the cost of removing them, although the state opined at argument that the net cost to the Rock Island (that is, the cost of removal minus the salvage value of any tracks and ties that are sold from the crossings) would be less than $1 million. The state is willing to do the work and bill the trustee for the expense, and argues that this would be an administrative expense just like the cost of carrying out the salvage operations themselves and would therefore be entitled to priority of payment from the bankrupt’s assets over the rest of the creditors. See 5 Collier on Bankruptcy ¶ 77.21, at pp. 611-14 (14th ed. 1978). As a matter of fact, the state has already restored a few of the crossings, and therefore also seeks reimbursement by the trustee for its expenses in doing so.
 

 The district judge refused to order removal of the crossings or reimbursement of the state’s expense of removal and the state has appealed. The situation with regard to bankruptcy appeals has become extremely confusing as a result of developments culminating in last summer’s bankruptcy amendments, see
 
 In re Riggsby,
 
 745 F.2d 1153 (7th Cir.1984), but none of these developments is pertinent to this case. Proceedings under section 77 of the Bankruptcy Act of 1898 were not transferred to the new bankruptcy courts established by the 1978 Act, see Bankruptcy Reform Act of 1978, Pub.L. 95-598, Title IV, § 409(a)(1)(A), 92 Stat. 2687, and thus the provisions relating to appeals from those courts are inapplicable to this case. Under section 24(a) of the old Act, 11 U.S.C. § 47(a) (1976 ed.), an order of a bankruptcy court (such as the district court in the present case) that rejects a claim against the bankrupt estate is appealable as a final order in a separable controversy. See
 
 In re UNR Industries, Inc.,
 
 725 F.2d 1111, 1116 (7th Cir.1984);
 
 In re Saco Local Development Corp.,
 
 711 F.2d 441, 444-45 (1st Cir.1983).
 

 The state’s concern about the abandoned crossings is that if they are neither removed (with restoration of each crossing to the condition it would be in if there had never been a railroad) nor maintained, eventually they will deteriorate and become an obstruction or hazard to highway traffic; some of the crossings, the state adds, already have deteriorated to that point. The potential danger is most dramatically presented by the railroad bridges — which if not removed or maintained will eventually collapse onto the highways below — and underpasses: if they are not removed or maintained their roofs will eventually cave in and the highways above will collapse. The state does not see why it should have to bear an expense for removal or maintenance that it would not have borne had there never been any railroad tracks for state highways to cross.
 

 “Administrative expenses consist of all the expenses incurred after the order for relief that are necessary to administer the estate and, if the debtor is reorganizing or is not immediately liquidating, to conduct the business of the debtor after the order for relief.” 3 Collier on Bankruptcy, 11 507.04[l][a], at p. 507-24 (15th ed. 1984). Thus a broker’s commission for selling salvaged track would be an administrative expense because it would be an unavoidable expense of liquidating the bankrupt estate in a manner that maximized the value of the estate for the benefit of the creditors, and thus the cost of the salvage contract in this case is an administrative expense because it is indispensable to the creation of a benefit for the creditors. But Iowa is not like our hypothetical broker, seeking to render to the bankrupt and hence to its creditors a service that would not be rendered if the provider were not assured of payment by being given super-
 
 *520
 
 priority. It is seeking in effect an order enjoining a prospective nuisance, or, what amounts to the same thing, an order reimbursing it for the cost of abating the prospective nuisance. Its interest is thus that of a kind of tort creditor, or conceivably, as we shall see, contract creditor — an interest competitive with rather than beneficial to the interests of those creditors and therefore not entitled to the priority of an administrative expense. A number of cases so hold, some with facts quite like those in this case. See
 
 In re Madison Rys.,
 
 115 F.2d 586, 589 (7th Cir.1940);
 
 In re International Ry.,
 
 85 F.Supp. 331, 340 (W.D.N.Y.1949);
 
 Village of Stillwater v. Hudson Valley Ry.,
 
 255 N.Y. 144, 154-55, 174 N.E. 306, 310 (1931);
 
 Westinghouse Elec. Mfg. Co. v. Barre & Montpelier Traction & Power Co.,
 
 98 Vt. 130, 139-40, 126 Atl. 594, 598 (1924). Although section 1171(a) of the new Bankruptcy Act (one of the few provisions of the new Act that are applicable to proceedings under section 77 of the old, see Bankruptcy Reform Act of 1978,
 
 supra,
 
 §§ 403(a), 403(b), 92 Stat. 2683) makes the satisfaction of a personal-injury or wrongful-death claim against a bankrupt railroad an administrative expense, that is not Iowa’s claim.
 

 Iowa might have a good argument for treating its claim as an administrative expense if the removal of the tracks were necessary to avert an imminent danger, a factor not alluded to in the cases we have cited. Then removal would be like buying a new electrical grade-crossing signal to replace one that had worn out — a transaction that would benefit creditors by protecting the bankrupt estate against tort liability for crossing accidents. Maybe some of the removals sought by the State of Iowa are in this category, but its request for superpriority is not so limited, and removals that will benefit the citizens of Iowa years after the reorganization is complete and the Rock Island ceases to be a railroad are unlikely to benefit the Rock Island’s creditors. It is true that in a reorganization the creditors commonly end up owning equity securities in the reorganized firm; and it is also true, as we shall see, that the abandonment of the crossings might not exonerate the firm from liability for injuries resulting from their becoming hazardous to people using them. So the proposed removals may eventually benefit some or even all of the creditors. But the benefit, if any, is too slight, indirect, conjectural, and remote to justify classifying the expense of restoration as an administrative expense.
 

 Although Iowa does not have a good claim for services rendered to the bankrupt estate, maybe it has a different kind of claim, the claim of a general creditor, most plausibly a tort creditor. The parties agree that the law applicable to deciding whether it has a claim is that of Iowa.
 

 Since a tort presupposes injury,
 
 Cenco Inc. v. Seidman & Seidman,
 
 686 F.2d 449, 453 (7th Cir.1982), we must consider what if any injury the railroad’s failure to restore the crossings has done to Iowa. It might seem there could be none— that the state’s claim is hopelessly premature, since the citizens of Iowa can sue for damages if and when they are injured by the deterioration of the crossings. But this is not so clear as it seems. It is true that if you create a dangerous condition and injury ensues you are liable for the injury. See, e.g.,
 
 Schmidt v. United States,
 
 179 F.2d 724 (10th Cir.1950);
 
 Clark v. E.I. Du Pont de Nemours Powder Co.,
 
 94 Kan. 268, 271, 146 Pac. 320-21 (1915). And it is probably also true that you cannot avoid liability by the facile route of declaring that you abandoned the land, or whatever else it was that created the danger, before the accident occurred. But it is less clear that if you abandon the land before any danger arises you remain liable for injuries that could have been prevented by maintaining the land in a safe condition. Maybe there is liability even in such a case; support for this position is found in some of the “overstaying your welcome” street railway cases discussed later. See also
 
 Central Rivers Towing, Inc. v. City of Beardstown,
 
 750 F.2d 565, 569-70 (7th Cir.1984). But it is not so clear as to require the state to sit back and do nothing, confident that
 
 *521
 
 the Rock Island will be fully liable in tort for any accidents caused by deterioration of the abandoned crossings. Additional complications are that by undertaking to restore some of the crossings the state may have put itself in a position where it rather than the Rock Island will be regarded as the owner of the crossings; that deterioration of the crossings may cause delays and inconvenience, short of personal injury, which no individual traveler may have an incentive to seek legal redress against (although the state could bring a public-nuisance suit); and that the reorganized Rock Island may not have sufficient assets to pay substantial damage judgments.
 

 Above all there is the fact that an ounce of prevention is worth a pound of cure. The state prudently does not want to wait for someone to be crushed by a falling railroad bridge before acting. Nor does it want to monitor each and every crossing continuously so that it can remove each one as soon as deterioration reaches the danger point. It wants to eliminate the possibility of harm by removing the abandoned crossings before they become dangerous. By doing so it will not only assure the safety of its highways but be able to schedule the necessary restorative work so that delay and inconvenience to the users of the highway are minimized. Presumably this is why it wants to arrange for the work itself and bill the Rock Island rather than leave it to the Rock Island to make the necessary arrangements. It wants in short to prevent nuisances well in advance, and thus its claim is analogous — but only analogous — to that of a tort creditor. Counsel for the state did say at argument that the state is only interested in removing those crossings that are an immediate danger to the traveling public, which would make its claim a straightforward nuisance claim. See Iowa Code Ann. §§ 319.7-319.9, 657.1, 657.2. But this was an afterthought. The state's briefs suggest no such limitation; its reply brief, for example, speaks of “removing unused railroad material from railroad rights of way where its presence,
 
 in time,
 
 would constitute a nuisance” (emphasis added).
 

 In arguing that there is a basis in law for such a claim, the state points first to an Iowa statute requiring railroads to maintain their crossings in good condition. See Iowa Code Ann. § 327F.2;
 
 City of Newton v. Chicago, R.I. & P.R. Co.,
 
 66 la. 422, 23 N.W. 905 (1885);
 
 Farley v. The C., R.I. & P.R. Co.,
 
 42 la. 234, 237 (1875); cf.
 
 Boston & M.R.R. v. County Comm’rs,
 
 300 Mass. 415, 418, 15 N.E.2d 455, 457 (1938). But the language of the statute makes clear that it applies only to operating railroads, whose crossings pose a much greater danger than those of defunct railroads— the danger of a collision. Apparently when the statute was passed in the middle of the nineteenth century — at the dawn of the great age of the railroads — the possibility that railroad lines would be abandoned was not envisaged, or if envisaged was not thought sufficiently large or imminent, or the resulting hazards great enough, to require statutory provision.
 

 Iowa also argues that there is a common law duty to remove abandoned crossings. But it cites no case in which such a duty is recognized. Although railroads have a common law duty not to obstruct highways or streams that is violated by allowing a grade crossing or bridge to fall into disrepair, see, e.g.,
 
 Metropolitan Sewerage Dist. v. Chicago, M., S.P. & P.R.R.,
 
 69 Wis.2d 387, 410-11, 230 N.W.2d 651, 664 (1975);
 
 Lemonweir River Drainage Dish v. Chicago, M., S.P. & P.R.R.,
 
 199 Wis. 46, 49-50, 225 N.W. 132, 133 (1929);
 
 Boston & A.R.R. v. City of Cambridge,
 
 159 Mass. 283, 383, 287, 34 N.E. 382 (1893); 2 Elliott & Elliott, A Treatise on the Law of Railroads § 852 (3d ed. 1921); 3
 
 id.
 
 §§ 1570, 1573, the eases all involve operating railroads and actual obstructions — not bankrupt railroads and potential obstructions. The cases seem in fact to be garden-variety nuisance cases, which this one is not.
 

 A land use that will create a nuisance can be enjoined in advance, as an alternative to abating the nuisance once it comes into being, see, e.g.,
 
 Payne v. Town
 
 
 *522
 

 of Wayland,
 
 131 la. 659, 661-62, 109 N.W. 203, 204 (1906), and an abandoned structure can be enjoined as a nuisance, see, e.g.,
 
 Puritan Holding Co. v. Holloschitz,
 
 82 Misc.2d 905, 906-07, 372 N.Y.S.2d 500, 502 (S.Ct.1975). But as with any exercise of the injunctive power to prevent a future injury, the applicant for the injunction must show that the injury is imminent, see, e.g.,
 
 Nicholson v. Connecticut Half-Way House, Inc.,
 
 153 Conn. 507, 511-12, 218 A.2d 383, 386 (1966), as well as that there is no adequate remedy at law. We shall assume that Iowa has shown the latter, but it surely has not shown the former. It has not tried to identify the particular crossings that it fears will become dangerous as a result of the abandonment, other than those it has already repaired. It wants an order removing all the crossings, even though it is quite possible that any future danger, especially at grade crossings and highway bridges, will arise from the state highway department’s neglect of its own responsibility to keep the highway part of the crossing in good repair. It is true as we have said that at oral argument the state pulled in its horns and suggested that all it really wanted was the removal of those crossings that are dangerous right now. But if there are any such crossings, the state is free to ask the district court for an injunction compelling their removal; the issuance of the injunction could be justified as necessary to protect the creditors of the railroad from the consequences of suits for injuries caused by the hazards. The state’s claim would be a garden-variety nuisance claim; but it is not the claim that the district court denied.
 

 Some decisions have required street railways to pull up their tracks when the railways discontinued service, and to restore the streets to their pristine state. See
 
 In re Madison Rys., supra,
 
 115 F.2d at 589;
 
 Capital Transit Co. v. Hazen,
 
 93 F.2d 250, 251-52 (D.C.Cir.1937);
 
 Boston Elevated Ry. v. Commonwealth,
 
 310 Mass. 528, 586, 39 N.E.2d 87, 123 (1942);
 
 Green v. City of Mechanicville,
 
 269 N.Y. 117, 121-22, 199 N.E. 26, 27 (1935);
 
 Village of Stillwater v. Hudson Valley Ry., supra,
 
 255 N.Y. at 149-51, 174 N.E. at 307-08;
 
 Mann v. City of Bakersfield,
 
 192 Cal.App.2d 424, 428, 13 Cal.Rptr. 211, 214 (Dist.Ct.App.1961);
 
 Village of Skaneateles v. Barber,
 
 78 N.Y.S.2d 79, 81-82 (S.Ct.1947). In some of these cases the franchise agreements between the street railway and the city were interpreted to impose this duty on the railway. In some the courts reasoned that when the franchise expires the railway’s authorization to occupy public property with its tracks is at an end and it becomes a trespasser, like a dinner guest who refuses to leave (presumably this analysis would apply to underpasses and bridges as well, since they occupy the subjacent and super-jacent space of the property). In some cases both ideas are expressed.
 

 The contractual theory (cf.
 
 Groves v. John Wunder Co.,
 
 205 Minn. 163, 286 N.W. 235 (1939)) cannot help the State of Iowa. The state has not placed in evidence any of the franchises or enabling statutes under which the Rock Island operated in Iowa, beginning in 1866. See Hayes, Iron Road to Empire: The History of 100 Years of the Progress and Achievements of the Rock Island Lines 53 (1953); The Chicago, Rock Island & Pacific Railway System and Representative Employees 101 (1900). So there is no basis for our finding a contractual duty to restore the crossings. Nor does the state limit its claim to crossings built by the Rock Island after the highways that were crossed had been built, a possibly significant distinction if the duty of restoration is founded on a franchise. Cf.
 
 Boston & A.R.R. v. City of Cambridge, supra,
 
 159 Mass. at 287, 34 N.E. at 383; 3 Elliott & Elliott,
 
 supra,
 
 § 1570. Our own research has unearthed the State of Iowa’s grant of lands to the Mississippi and Missouri Rail Road Company, the predecessor in Iowa of the Rock Island, but the grant contains no conditions relating to the abandonment of rail service or the restoration of crossings. See Rail Road Grant, Laws of Iowa, Extra Sess. 1856, ch. 1.
 

 The overstaying-your-welcome (trespass) rationale may seem quite helpful to Iowa, since in
 
 Village of Stillwater,
 
 the most
 
 *523
 
 frequently cited case for that rationale, the New York Court of Appeals had held that in abandoning its operations the railroad had lost its franchise and hence its right to have tracks in the village’s streets. But that rationale is at bottom contractual also. In
 
 Green v. City of Mechanicville, supra,
 
 the same court explained that the critical thing in
 
 Village of Stillwater
 
 was that “a municipal license to the railway company had for sufficient cause been withdrawn,” 269 N.Y. at 121, 199 N.E. at 27, whereas in
 
 Green
 
 itself the license could not be revoked without a resolution, never passed, of the village board of trustees. This meant that even though the railway had abandoned service years earlier, it was not a trespasser. We do not know the terms on which the Rock Island obtained and held its easements over or through or under Iowa state highways. Maybe those easements expired automatically when the railroad abandoned its lines, but maybe as in
 
 Green
 
 some subsequent action was necessary and has never been taken to revoke the easements and make the railroad a trespasser.
 

 Although we have found one case, not from Iowa, which states that “under the common law it was a utility’s duty, upon abandonment of its tracks and services, to remove the tracks and restore the invaded highway,” the next sentence (following citations) blurs the picture by noting that “this could be changed by the grant or by municipal consent,” again suggesting the importance of the terms on which the railroad is using the highway.
 
 West Penn Rys. Co. v. Pennsylvania Public Utility Comm’n,
 
 142 Pa.Super. 140, 148-49, 16 A.2d 639, 544 (1940). That decision provides too skimpy a foundation for our concluding that railroads in Iowa that go out of business have a common law duty to restore all their crossings regardless of the terms on which the railroads obtained their easements in the first place.
 

 In thus rejecting Iowa’s claim that the Rock Island has a legal obligation upon abandonment to remove all its crossings, we are mindful that section 77(b) of the Bankruptcy Act of 1898, 11 U.S.C. § 205(b) (1976 ed.), allows contingent claims to be proved. Iowa’s claim may seem to bear at least a family resemblance to contingent claims based on predictable but delayed lung disease from exposure of workers to asbestos manufactured in the past by firms currently being reorganized in bankruptcy. See
 
 In re UNR Industries, Inc., supra,
 
 725 F.2d at 1119-20, suggesting that such claims might be provable in a reorganization in bankruptcy; Jackson,
 
 Avoiding Powers in Bankruptcy,
 
 36 Stan.L.Rev. 725, 754-56 and n.89 (1984). But the purpose of allowing contingent claims to be proved and discharged in a reorganization is to make it likelier that the bankrupt firm can emerge from the reorganization with fair prospects of success, unhampered by the overhanging threat of liability for claims that had not been discharged, see, e.g.,
 
 City Farmers Trust Co. v. Irving Trust Co.,
 
 299 U.S. 433, 438-39, 57 S.Ct. 292, 294-95, 81 L.Ed. 324 (1937)—a big problem in the asbestos cases, but not here. The Rock Island’s prospects for emerging from reorganization as a viable firm will not be impaired by the possibility of future liability for nuisance or negligence caused by deterioration of its abandoned crossings. In any event such liability is too nebulous to count as a contingent claim; the amount is too uncertain and the claimants unknown. See, e.g.,
 
 Connecticut Ry. & Lighting Co. v. Palmer,
 
 305 U.S. 493, 502, 59 S.Ct. 316, 322, 83 L.Ed. 309 (1939). It is a matter of speculation if and when and where the abandonment of the crossings will ripen into a hazard, or cause an injury, for which the Rock Island will be liable under tort law. And to treat the state’s claim as a contingent claim provable in bankruptcy would be an end run around our previous conclusion that, viewed as an effort to abate a prospective nuisance, the state’s claim is premature.
 

 Although, despite all we have said, it might not be beyond the bounds of judicial ingenuity to devise some legal basis for Iowa’s claim, we are reluctant to strew further obstacles in the path of railroads seeking to abandon hopelessly unprofitable
 
 *524
 
 lines, by imposing novel legal burdens on such railroads. We need not reach the trustee’s argument that if the Rock Island does have a duty under Iowa law to remove its abandoned highway crossings, that duty is preempted by federal law governing railroad abandonments and railroad bankruptcies. But we are well aware that states, acting on behalf of shippers hurt by abandonment, have been in the forefront of efforts to delay the abandonment of railroad lines; that a previous effort of the State of Iowa to impede abandonment of railroad lines in the state was held preempted by federal law in
 
 Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,
 
 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981); cf.
 
 In re Boston & Maine Corp.,
 
 596 F.2d 2 (1st Cir.1979); and that when abandonment occurs as a consequence of bankruptcy the effect of recognizing a new financial obligation of the railroad is to reduce the assets available for distribution to the other creditors.
 

 Finally, since bankruptcy proceedings are equity proceedings, we think it proper to point out that the state has slept on its rights for an unconscionable time. The state has been a party to the Rock Island reorganization proceeding from the beginning. When the Rock Island first asked to be allowed to abandon its lines and liquidate its rail assets, the state could have asked the district judge to condition his permission on the railroad’s agreeing to clean up after itself. And when the trustee submitted the salvage contract to the district judge, the state, which participated in the hearing on the contract, could have asked that the contract be amended to require the salvage company to take up the crossings as well. There could be no misunderstanding that the contract already required this, especially since the contract was explicit in requiring the restoration of unpaved crossings to their pristine state. The state said nothing. The salvage operations were carried on for a year and a half before the state filed its petition with the district judge. Maybe if the state had spoken up sooner the salvage company could have removed the abandoned grade crossings while it was taking up the adjacent rails and ties literally feet away, and at little extra cost. For the state now to send crews to all these sites and remove the crossings may be much more costly, and the state wants to visit the entire cost on the Rock Island — which is to say on the Rock Island’s (other) creditors.
 

 We do not place our decision on the ground of laches; the trustee has not argued laches to us or presented any evidence that the removal of the crossings would in fact be more expensive today than if it had been done as part of the original salvage operation. But the State of Iowa’s long delay in asserting a right to removal is practical evidence that its claim is an afterthought.
 

 Affirmed.