SOUTHEAST CASS WATER RESOURCE DISTRICT, a political subdivision of the State of North Dakota, Plaintiff and Appellee,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, a Delaware Corporation, Defendant and Appellant.

Civ. No. 940106.

Supreme Court of North Dakota.

Feb. 8, 1995.

Steven E. McCullough, Ohnstad Twichell, West Fargo, for plaintiff and appellee.

Daniel J. Crothers, Nilles, Hansen & Davies, Ltd., Fargo, for defendant and appellant.

Julie Ann Krenz, Asst. Atty. Gen., Atty. General's Office, Bismarck, for amicus curiae, State of N.D. Submitted on brief.

MESCHKE, Justice.

Burlington Northern Railroad Company (BN Railroad) appeals from a summary judgment declaring it responsible for the costs of necessary modifications to its bridges and culverts to accommodate drainage improvements directed by the Southeast Cass Water Resource District (District) for Cass County Drain 45. We conclude that NDCC 61–16.1–42 constitutionally places upon BN Railroad the continuing responsibility for the costs of accommodating its track to necessary drainage improvements. We affirm.

## I

Drain 45 was established in 1948 for part of Cass County at West Fargo along a natural channel. The drain intersects two railroad tracks operated by BN Railroad, a main line and a by-pass line. At both crossings, BN Railroad has existing openings under the tracks to accommodate the flow of water. Potential flooding in the drainage area, largely from increasing urbanization, caused the District to plan to deepen, expand, and widen Drain 45.

After the drain's improvement, BN Railroad's main line bridges and its by-pass line culverts will no longer accommodate the expected water flow, the District determined. The District notified BN Railroad to modify the bridges and culverts to accommodate increased runoff. If left unaltered, BN Railroad's bridges and culverts will artificially obstruct the expected flow through Drain 45 and cause water to back up into West Fargo in times of heavy precipitation, the District determined. The need to modify the drain, the bridges, and the culverts was not disputed by BN Railroad, but it did dispute who must bear the expense of the necessary changes to the bridges and culverts.

After negotiations failed, the District sought a declaratory judgment that BN Railroad was responsible under NDCC 61–16.1–42 "for the costs associated with making the necessary openings through its track[s] at the point where railroad track[s] and [the]

drains intersect[ ]" to accommodate the increased water flow. By a partial summary judgment, the trial court concluded that NDCC 61–16.1–42 required BN Railroad to bear the costs of modifying the bridges and culverts, and ruled:

> [T]he requirement contained in section 61–16.1–42 of the North Dakota Century Code that railroad companies pay for the costs of making, building and keeping in repair the necessary openings at the points where drains intersect with railroad tracks is an appropriate exercise of a valid police power; and ..., therefore, section 61–16.1–42 of the North Dakota Century Code does not violate the constitutional prohibition of taking or damaging private property without just compensation as found in section 16 of article I of the North Dakota Constitution.

After other pending claims were resolved, BN Railroad appealed this final summary judgment, claiming that the statute was wrongly construed to compel the railroad to modify its existing bridges and culverts without compensation and, if the statute did place the expense on the railroad, the statute is unconstitutional as a taking of private property for public use without just compensation.

## II

■ Section 61–16.1–42 of the North Dakota Century Code directs:

*Drains along and across public roads and railroads.* Drains may be laid along, within the limits of, or across any public road or highway, but not to the injury of such road. In instances where it is necessary to run a drain across a highway, the state highway department, the board of county commissioners, or the board of township supervisors, as the case may be, when notified by the water resource board to do so, shall make necessary openings through the road or highway at its own expense, and shall build and keep in repair all required culverts or bridges as provided under section 61–16.1–43. In instances where drains are laid along or within the rights of way of roads or highways, the drains shall be maintained and kept open by and at the expense of the water resource district concerned. A drain may be laid along any railroad when necessary, but not to the injury of the railroad, and *when it is necessary to run a drain across the railroad, the railroad company, when notified by the water resource board to do so, shall make the necessary opening through such railroad, shall build the required bridges and culverts, and shall keep them in repair.*

(Emphasis added). BN Railroad argues this section is not intended to compel it to modify the bridges and culverts at its own expense.

BN Railroad urges that the phrase, "at its own expense," used in the part that describes a governmental unit's responsibility for the opening when a drain intersects a public road or highway,[1] but omitted from the part that

---

1. Although NDCC 61–16.1–42 requires a governmental unit to accommodate drainage "at its own expense," NDCC 61–16.1–43 directs some cost-sharing for certain bridges and culverts at the intersections of drains with certain highways:

*Construction of bridges and culverts—Costs.* The water resource board shall construct such bridges or culverts over or in connection with a drain as in its judgment may be necessary to furnish passage from one part to another of any private farm or tract of land intersected by such drain. The cost of such construction shall be charged as part of the cost of constructing the drain, and any such bridge, culvert, or passageway shall be maintained under the authority of the water resource board, and the necessary expense shall be deemed a part of the cost of maintenance.

Whenever any bridge or culvert is to be constructed on a county or township highway system over and across or in connection with a drain, the cost of constructing such bridge or culvert shall be shared in the following manner:

1. The state water commission may, if funds are available, participate in accordance with such rules and regulations as it may prescribe. The remaining cost shall be borne forty percent by the county and sixty percent by the district which has created the need for such construction.

2. If, however, moneys have not been made available to the commission for participation in accordance with subsection 1, then forty percent of the cost of a bridge or culvert shall be paid by the county and sixty percent shall be charged as cost of the drain to the district.

3. Where such bridges or culverts are constructed with federal financial participation, the costs exceeding the amount of the federal participation shall be borne by the district

describes a railroad's responsibility when the drain intersects a railroad, indicates only that the railroad must do the work and is not financially responsible for the costs. According to BN Railroad, this interpretation of the statute is supported by the Legislature's defeat of a 1963 amendment to the precursor of NDCC 61–16.1–42 that would have added the phrase, "at its own expense," to the part of the statute that describes the railroad's responsibility when a drain intersects a railroad.[2]

The District says NDCC 61–16.1–42 places responsibility upon the railroad not only to perform the work to modify its own bridges and culverts, but also to absorb the costs of that work. Because the statute does not authorize any reimbursement to the railroad company for doing the work, the District urges that the statute plainly means that the

and county according to the provisions of this section, as the case may be.

2. Section 61–16.1–42 derives from section 1462 of the 1895 Revised Codes of North Dakota: *Duty of railroad companies*. Drains may be laid along, within the limits of or across any public road, and when so laid out and constructed or when any road shall hereafter be constructed along or across any drain it shall be the duty of the board of county commissioners, or township supervisors, as the case may be, to keep the same open and free from all obstructions. A drain may be laid along any railroad when necessary, but not to the injury of such road, and when it shall be necessary to run a drain across a railroad it shall be the duty of such railroad company, when notified by the board of drain commissioners to do so, to make the necessary opening through said road and to build and keep in repair suitable culverts or bridges.

This 1895 statute remained virtually unchanged through a series of recodifications. 1905 Revised Codes of North Dakota § 1837; 1913 Compiled Laws of North Dakota § 2481; North Dakota Revised Code of 1943 § 61–2135. Explicit reference to expenses for a drain across a state or federal highway first appeared in the statute in 1945, when the Legislature amended § 61–2135 to require the "State Highway Department" to "make the necessary opening through said highway" and "build and keep in repair suitable culverts or bridges at its own expense." 1945 N.D.Laws ch. 323 § 1. In 1955, the Legislature specifically authorized allocation of some costs when a drain crosses a highway in the cost-sharing provisions of the precursor to NDCC 61–21–32 that was substantially similar to current NDCC 61–16.1–43. 1955 N.D. Laws ch. 347 §§ 31 and 32; 1957 N.D.Laws ch. 387 § 1 (codified as §§ 61–2131 and 61–2132 in the 1957 Supplement to the North Dakota Revised Code of 1943).

In 1963, to encourage "drainage districts ... to reorganize under our water management district laws," the Legislature enacted NDCC 61–16–46 and –47 to supplement the water management district laws. Report of the North Dakota Legislative Research Committee, Thirty-eighth Legislative Assembly, at 54 (1963); 1963 N.D.Laws ch. 421 §§ 9 and 10 (repealed 1981). These provisions parroted part of NDCC 61–21–31 and –32, relating to drainage districts. As introduced, § 9 of 1963 House Bill No. 535 did not explicitly state, as did the part for highways, that a railroad was obligated to make necessary openings through its tracks "at its own expense." The House Committee on Agriculture, however, recommended an amendment that the House passed, stating that the railroad "shall make the necessary opening through such railroad *at its own expense....*" (Emphasis added). Journal of the House of the Thirty-eighth Session of the Legislative Assembly, at 345–46, 444–45 (1963). During the Senate hearings on the bill, a "Wahpeton attorney ... representing N.D. Railway lines testified against" the House amendment. Minutes of the Senate Committee on Natural Resources, at 8 (March 1, 1963). The Senate Committee on Natural Resources recommended, and the Senate passed, its own amendment to the bill, deleting the "at its own expense" language and added:

The cost of constructing such bridges or culverts shall be shared in the following manner: fifty percent to the railroad company; fifty percent to the water management district which has created the need for such bridge or culvert.

Journal of the Senate of the Thirty-eighth Session of the Legislative Assembly, at 746, 824–25 (1963). The House refused to concur in the Senate amendment, and a conference committee was formed. House Journal, at 1118–19, 1127; Senate Journal, at 923. The conference committee did not concur with the Senate amendment and further recommended that the House amendment adding "at its own expense" be deleted from the bill. House Journal, at 1307–08; Senate Journal, at 1043–44. The bill was then passed by both chambers without any explicit language on the railroad's responsibility, or lack of it, for costs.

In 1981, water resource districts were created with emphasis on "hydrologic boundaries," and water management districts were eliminated to avoid duplication of jurisdiction. Report of the North Dakota Legislative Council, Forty–Seventh Legislative Assembly, at 110–11 (1981); 1981 N.D.Laws ch. 632 § 1. *See* NDCC 61–16.1–01. Present NDCC 61–16.1–42 and –43 are essentially recodifications of former sections 61–16–46 and –47 to conform to this creation of water resource districts to replace water management districts.

railroad must carry the costs. This, coupled with the lack of a procedure like that in NDCC 61–16.1–43 for cost-sharing by the district, the District says evidences an intention that the railroad is responsible for the costs of modifying its own structures. The District points out this court has already used this interpretation in *State ex rel. Trimble v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 28 N.D. 621, 150 N.W. 463 (1914), when we construed a forerunner to this statute.

■■■ Interpretation of a statute is a question of law that is fully reviewable by this Court. *Zuger v. North Dakota Ins. Guar. Ass'n*, 494 N.W.2d 135, 136 (N.D.1992). We first look to the language of the statute itself. *Nesdahl Surveying & Eng'g v. Ackerland Corp.*, 507 N.W.2d 686, 688 (N.D.1993). Unless otherwise defined in the Code, words are given their plain, ordinary, and commonly understood meaning. *Kim–Go v. J.P. Furlong Enterprises, Inc.*, 460 N.W.2d 694, 696 (N.D.1990). Only if the language of a statute is ambiguous will extrinsic aids be used to ascertain the Legislature's intent. *Nesdahl* at 689; NDCC 1–02–39. As we said in *Zuger* at 137, a statute is ambiguous if it is susceptible to differing, but rational, meanings.

BN Railroad and the District each offer rational but different meanings for this statute on a railroad's responsibility for the costs of changing bridges and culverts to accommodate drainage. BN Railroad reasonably argues that use of the "at its own expense" phrase in the part of the statute on highway-drain crossings and omission of that phrase from the part of the statute on railroad-drain crossings indicates an intent to save the railroad from the costs. On the other hand, the District reasonably argues that, because the statute is silent on any reimbursement to the railroad for the necessary work, the railroad is responsible for the costs of the work that the statute directs it to do. We conclude that the statute is ambiguous.

### III

When a statute is ambiguous, we consider the legislative history in assessing the Legislature's intention. NDCC 1–02–39(3). BN Railroad argues the Legislature's defeat of the proposed 1963 amendment to the forerunner of NDCC 61–16.1–42, that would have added the phrase, "at its own expense," to the part of the section on a drain intersecting a railroad, shows the Legislature's intention that the railroad not absorb the costs of the work.

■■ While a subsequent amendment to a statute may be useful sometimes to shed light on the intent of an earlier version of the statute, *Effertz v. North Dakota Workers Compensation Bureau*, 525 N.W.2d 691 (N.D.1994), legislative inaction is rarely helpful. In *State ex rel. Spaeth v. Eddy Furniture Co.*, 386 N.W.2d 901, 904 (N.D.1986), we held a later Legislature's defeat of an amendment on the subject cannot evidence what a prior Legislature intended when it first enacted the statute. Since then, we have often pointed out that the defeat of a proposed amendment by a later Legislature does not help answer questions about the original intent of an enactment. *Peterson v. McKenzie County School Dist. 1*, 467 N.W.2d 456, 462 (N.D.1991); *Coles v. Glenburn Public School Dist. 26*, 436 N.W.2d 262, 264 n. 2 (N.D.1989). That reasoning applies here.

Any attempt to glean legislative intent from the actions of the 1963 Legislature would be especially futile in this case because diametrically different amendments to the forerunner of this section were defeated. *See* Footnote 2. One proposed amendment would have specified the railroad perform the work "at its own expense"; the other would have divided the costs of work on the railroad's crossings equally between the railroad and the water management district. Just as one could speculate that rejection of the "at its own expense" amendment indicates the Legislature's intention that the railroad should not be responsible for the cost, so too could one speculate that rejection of the cost-sharing amendment indicates the Legislature's intention that the railroad is responsible for the whole cost. The inaction of the 1963 Legislature does not clarify this ambiguity.

When a statute is ambiguous, we also consider the "common law or former statutory provisions, including laws upon the same or

similar subjects," as well as the "circumstances under which the statute was enacted." NDCC 1–02–39(2) and (4). BN Railroad argues that requiring a railroad to pay for the work "is contrary to the express statutory procedure adopted by the Legislature to pay for water and drain projects." But the statutes cited by BN Railroad, NDCC 61–16.1–06, –15 to –18, –20, treat how a water resource district finances general drainage costs and assesses them against affected landowners. Those statutes do not fix what costs a district must pay. On the other hand, NDCC 61–16.1–42 and –43 treat what intersection costs a district must bear. The latter sections do not specify that a district is obligated to pay any of the costs for a drain to go under a railroad track. No statute authorizes cost-sharing with or reimbursement to a railroad for the costs of modifying bridges and culverts to accommodate drainage.

Historically, this statute about the intersection of a drain with a railroad has remained virtually the same since its inception in 1895.[3] *See* Footnote 2. That language was interpreted by this Court in *State ex rel.*

*Trimble v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 28 N.D. 621, 150 N.W. 463 (1914). *Trimble* considered planned drainage improvements for the Mouse River, a non-navigable natural watercourse that drained parts of several counties. Removal of six rows of piling supporting the railroad bridge across the river, built ten years earlier, was "necessary to obtain the flow which the [engineer's] plans contemplate." *Trimble* 150 N.W. at 464. This Court held that the railroad was required to remove, at its own expense, any artificial obstructions, like the pilings, to the flow of the modified drainage channel. *Trimble* explained that "if a railway crosses an unnavigable stream which serves for the drainage of any given area of land, it must accommodate itself to the drainage that may be reasonably anticipated, both present and prospective." *Id.* at 466. Also, after quoting the forerunner to NDCC 61–16.1–42, section 1837 of the 1905 Revised Codes of North Dakota, the Court reasoned:

It may be conceded that the drainage board had the right as agents of the parties interested and perhaps of the state as

---

**3.** Even before enactment of the 1895 forerunner to our current statute, territorial laws authorized assessment of costs against railroad companies for drainage projects crossing railroad tracks.

In 1883, the Legislature of Dakota Territory enacted general laws on drainage that specifically treated railroads. 1883 Dakota Laws, ch. 75, §§ 2, 28. One section required "viewers" to apportion costs for "any ditch, drain, or watercourse." 1883 R.C. of Dakota, Pol.Code, Chapter LVI § 2. For construction of drains, the "viewers" were to "set apart and apportion to ... each corporate road or railroad, ... a share of said work in proportion to the benefits which will result to each from such improvement, and give location of each share, its length in feet, and the estimated number of cubic yards of earth to be removed therefrom, and the price per cubic yard, and the cost of the construction of each, or allotment separately, and specify the manner in which the work shall be done." *Id.* For maintenance of drains, "[w]hen any ditch, established under this act drains either in whole or in part any public or corporate road or railroad, or benefits any of such roads, ... the viewers or reviewers shall apportion ... to the company, if a corporate road or railroad, or railroad, [sic] such portion of the costs and expenses thereof as to private individuals, and require them to pay said costs and perform said labor in like manner as individuals." 1883 R.C. of Dakota, Pol.Code, Chapter LVI § 28. Since 1883, railroads have

been financially responsible for contributing to the costs of construction and maintenance of drains crossing the railroads.

Territorial amendments in 1885 and 1887 made only minor wording changes. 1885 Dakota Laws, ch. 47; 1887 Dakota Laws, ch. 43; 1887 C.L. of Dakota, §§ 2048, 2074. Although wording was omitted that specified the railroads perform the maintenance work itself, the statute continued to authorize apportioning costs for both construction and maintenance to the railroads.

In 1895, the State Legislature repealed "Chapter 75 of the Session Laws of 1883 and all acts amendatory thereof ...," 1895 N.D.Laws ch. 51 § 32, and enacted an entire new chapter on "Construction and Maintenance of Drains in This State," including a section specifically enumerating the "Duty of Railroad Companies." 1895 N.D.Laws ch. 51 § 19. As explained in footnote 2, this new section directed that "when it shall be necessary to run a drain across a railroad it shall be the duty of such railroad company ... to make the necessary opening through said road and to build and keep in repair suitable culverts or bridges." 1895 R.C.N.D. § 1462. It is this wording that has remained virtually unchanged since then. *See* NDCC 61–21–31 (drainage projects); NDCC 61–16.1–42 (operation of water resource districts). Drainage laws that impose the costs of accommodation upon the railroad are embedded deeply in our State's traditions.

a whole to require the removal of any material and artificial obstructions to the flowage of the water in the stream. It may also be conceded that the upper riparian owners would have had the right in case of an obstruction which was injurious to them, or in case of the failure of the railway company to remove the same, to themselves enter upon the land of such company and to remove it *at its expense.*

*Trimble* at 470 (emphasis added). We have no doubt the *Trimble* statements accurately depicted the prevailing understanding at the time, and clearly applied the statute to make the railroad responsible for the modification costs as well as the work.

■ Statutes that are substantially the same as previously existing statutes are construed as continuations of the same law. *State ex rel. Sprynczynatyk v. Mills,* 523 N.W.2d 537, 540 (N.D.1994); NDCC 1–02–25. That part of the original statute has remained intact to this day. Related statutes reinforce this interpretation. NDCC 61–16.1–09(16) authorizes the District to "[o]rder or initiate appropriate legal action to compel the entity responsible for the maintenance and repair of any bridge or culvert to remove ... any artificial block which hinders or decreases the flow of water through such bridge or culvert." Another subsection directs railroads to "cooperate with [water resource] districts in this effort" to "[c]oordinate proposals for installation, modification, or construction of culverts and bridges ... to achieve appropriate sizing and maximum consistency of road openings." NDCC 61–16.1–09(21). We therefore conclude that NDCC 61–16.1–42 places continuing responsibility for the costs of accommodating the increased drainage in this case upon BN Railroad.

■ Still, our inquiry is not complete. If a statute is susceptible of two constructions, one that would render it of doubtful constitutionality and one that would not, the constitutional one must be selected. *Matter of Adoption of K.A.S.,* 499 N.W.2d 558, 567 (N.D. 1993); NDCC 1–02–38(1). We therefore consider BN Railroad's argument that NDCC 61–16.1–42 as so construed would violate the North Dakota Constitution.

## IV

■ The North Dakota Constitution, art. I, § 16, directs that "[p]rivate property shall not be taken or damaged for public use without just compensation...." Yet, we cannot interpret our state constitution to grant narrower rights than guaranteed by the federal constitution. *See State v. Matthews,* 216 N.W.2d 90, 99 (N.D.1974). So we look to both state and federal precedents on regulatory taking of private property for public use.

■ BN Railroad submits that the required changes will "involve between three and four hundred thousand dollars and the substantial rerouting of railroad traffic," creating "an unjustified expense for which [the railroad] itself will derive no benefit." "By forcing [it] to comply with Section 61–16.1–42," BN Railroad argues, the District "has effectively taken [BN Railroad's] right-of-ways crossing Drain 45 and committed them to public use." BN Railroad centers its argument on this Court's recognition that the scope of the North Dakota constitutional clause on takings for public use is broader in some respects than its Fifth Amendment counterpart in the United States Constitution, citing *Grand Forks–Traill Water Users, Inc. v. Hjelle,* 413 N.W.2d 344 (N.D.1987), *appeal dismissed* 484 U.S. 1053, 108 S.Ct. 1002, 98 L.Ed.2d 969 (1988). In addition, BN Railroad points out, citing *Minch v. City of Fargo,* 332 N.W.2d 71 (N.D.1983), *cert. denied* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983), a public entity can cause compensable damage to property without fully taking it.

The District relies on clear precedents, both federal and state, for its argument that there is no compensable taking in requiring a railroad to absorb the costs of changing its bridges and culverts to accommodate drainage changes. *Chicago, B. & Q. Ry. Co. v. Illinois ex rel. Grimwood,* 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596 (1906); *City of Grafton v. St. Paul, M. & M. Ry. Co.,* 16 N.D. 313, 113 N.W. 598 (1907); *State ex rel. Trimble v. Minneapolis, St. P. & S. S. M. Ry. Co.,* 28 N.D. 621, 150 N.W. 463 (1914); *Lake Shore & Michigan S. Ry. Co. v. Clough,* 242 U.S. 375, 37 S.Ct. 144, 61 L.Ed. 374 (1917).

Each of these decisions held that a state's police-power regulation that required a railroad to adjust its track for the intersection of a public way was not a taking of the railroad's property for public use.

In *Grimwood*, the earliest of these precedents, the railroad's bridge crossed a creek. The drainage district proposed modifications to the creek to improve the drainage structure and to better drain land upstream. The drainage district notified the railroad of its statutory responsibility to build a new bridge at the intersection with the creek to suitably accommodate the modified channel. The Supreme Court summarized the railroad's argument:

> The contention of the railway company is that, as its present bridge was lawfully constructed, under its general corporate power to build, construct, operate and maintain a railroad, in the county and township aforesaid, and as the depth and width of the channel under it were sufficient, at the time, to carry off the water of the creek as it then flowed, and now flows—the foundation of the bridge cannot be removed and its use of the bridge disturbed, unless compensation be first made or secured to it in such amount as will be sufficient to meet the expense of removing the timbers and stones from the creek and of constructing a new bridge of such length and with such opening under it as the plan of the Commissioners requires. The company insists that to require it to meet these expenses out of its own funds will be, within the meaning of the Constitution, a *taking* of its property for public use without compensation, and, therefore, without due process of law, as well as a denial to it of the equal protection of the laws.

*Grimwood*, 200 U.S. at 582, 26 S.Ct. at 345. The Supreme Court ruled it was the railroad's implied-in-law duty to maintain an opening under the bridge adequate to accommodate "the volume of water as might result from lawful, reasonable regulations established by appropriate public authority from time to time for the drainage of lands on either side of the creek." *Id.* at 586, 26 S.Ct. at 347. The Supreme Court adopted the lower court's summary of the applicable law:

> "[W]here there is a natural waterway, or where a highway already exists and is crossed by a railroad company under its general license to build a railroad, and without any specific grant by the legislative authority to obstruct the highway or waterway, the railroad company is bound to make and keep its crossing, at its own expense, in such condition as shall meet all the reasonable requirements of the public as the changed conditions and increased use may demand."

*Id.* at 587, 26 S.Ct. at 347 (quoting *Chicago, B. & Q. Ry. Co. v. People ex rel. Grimwood*, 212 Ill. 103, 72 N.E. 219, 223 (1904)). The Supreme Court summarily rejected the railroad's taking claim:

> [W]e hold it to be the duty of the railway company, at its own expense, to remove from the creek the present bridge, culvert, timbers and stones placed there by it, and also (unless it abandons or surrenders its right to cross the creek at or in the vicinity of the present crossing) to erect at its own expense and maintain a new bridge for crossing that will conform to the regulations established by the Drainage Commissioners, under the authority of the State; and such a requirement if enforced will not amount to a taking of private property for public use within the meaning of the Constitution, nor to a denial of the equal protection of the laws.

*Grimwood*, 200 U.S. at 595, 26 S.Ct. at 351. Thus, *Grimwood* held that requiring a railroad at its own expense to modify its bridge across a drain to conform to a state regulation is not a taking of private property for public use.

In *City of Grafton*, 113 N.W. 598, the city condemned for street purposes a strip of land within the railroad's right of way. The railroad sought reimbursement for costs of structural changes such as grading, planking, and building sidewalks. The city responded that these expenses were "made necessary by a statute of this state, enacted under the so-called police power of the state, and therefore that they cannot be considered a proper element of damage in this action." *City of Grafton* at 601. This court held that

the railroad's expenses for the structural changes were not compensable:

> [T]he United States Supreme Court, under a statute identically the same as our own, held that no damages could be allowed for structural changes made necessary by such crossing, and they also held, for reasons which appeal to us as clearly sound and unanswerable, that such expenditures are made necessary in order to comply with the express statutory enactments aforesaid, which are construed as mere police regulations. As stated by the Supreme Court of the United States in *C., B. & Q. Ry. Co. v. Chicago*, [166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897)]: "The expense of erecting gates, planking the crossings, and maintaining flagment [sic], which will necessarily result in the laying out of a street across a railroad, must be regarded as incidental to the exercise of the police powers of the state, and do not constitute an element of just compensation to the railroad."

*Id.* 113 N.W. at 602. The expenses of a railroad to comply with a reasonable police-power regulation is not a compensable taking.[4]

▮ *Lake Shore*, a federal precedent like the North Dakota precedent in *Trimble* discussed earlier, considered changes in drainage that compelled a railroad to modify its crossing. In *Lake Shore*, acting under an Indiana Railway Law that required railroads to construct their railways over watercourses "so as not to interfere with the free use of the same," a drainage commission approved plans for an artificial drainage channel that required railroads to absorb substantial expense in bridging the channel. One of the railroads had earlier constructed a bridge that did not obstruct the stream's natural flow. The railroads argued, because their railroads were not within the area to be drained, they did not contribute to the need for drainage, they would not be benefited, and their tracks could only be taken with appropriate compensation. The Supreme Court observed that none of the railroad lands were actually "expropriated," but the damage was "confined to a temporary inconvenience in the use of their rights of way pending the construction of the drain and the necessity for making substantial expenditures of money in order to pass their railroads over the new watercourse." *Lake Shore*, 242 U.S. at 379, 37 S.Ct. at 146.

> In view of the obligations assumed by the respective companies when they accepted their franchises at the hands of the State, it is very clear that the State may exercise its police power in laying out an artificial watercourse across the rights of way without making compensation to the companies for the inconvenience and expense to which

---

4. Similar street-crossing decisions preceded drainage-crossing decisions in the United States Supreme Court. *Chicago, B. & Q. Ry. Co. v. City of Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897) (When city extends a street across a railroad, it is not inhibited by the constitutional injunction against taking private property for public use without compensation, nor bound to award damages for expenses of railway company constructing gates, planking the crossing, maintaining watchmen, and the like, that public regulations require for the safety of lives and property. Neither is the city bound to compensate the railroad for depreciation in the value of the railroad by reason of the street crossing). There has been some shift in this police-power analysis for a highway crossing.

Competition with the railroads from highway transportation, together with greater taxation on railroads than on truck and bus transportation, caused the United States Supreme Court to require the courts to carefully weigh the arbitrariness and reasonableness of street-crossing costs imposed on railroads by police power regula-

tions. *Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949 (1935). Since *Nashville*, both decisions and legislation have often tempered the ratio of costs imposed on railroads for highway crossings and grade separations used by competing forms of highway transportation. *Compare Atchison, T. & S.F. Ry. Co. v. Public Utilities Comm'n of California*, 346 U.S. 346, 74 S.Ct. 92, 98 L.Ed. 51 (1953) (railroads in the streets by permission of state or its subdivisions could not complain that their assessment of fifty percent of improvements for public safety and convenience was not based solely on special benefits accruing to them, and regulatory agency's refusal to allocate costs on the basis of benefits alone was not an arbitrary exercise of police power). The drainage improvements in this case do not favor any competing form of transportation like navigation, nor does NDCC 61–16.1–42 require railroads to contribute to their competitors. This line of precedents does not herald any shift in police-power analysis for a drainage improvement authorized by a state legislature.

they are thereby subjected, unless, indeed, it be made to appear that the power is being exerted arbitrarily, or wantonly, or for private as distinguished from public benefit, or otherwise in disregard of the fundamental rights of the companies concerned, in either of which cases there would be an abuse rather than an exercise of the power, and the project could not lawfully be carried out against their opposition, with or without compensation. *Id.* at 382, 37 S.Ct. at 147. *See also Wabash Ry. Co. v. South Daviess County Drainage Dist.,* 12 F.2d 909, 914–15 (8th Cir.1926) (same, relying on *Lake Shore*), *cert. denied,* 273 U.S. 751, 47 S.Ct. 455, 71 L.Ed. 873 (1927). These precedents, federal and state, demonstrate that continuing police-power

regulations that compel a railroad to adjust to drainage changes without compensation are not a compensable taking.[5]

Several other North Dakota constitutional clauses, first adopted at its 1889 Constitutional Convention over a hundred years ago, are relevant to the police-power analysis here. *See* N.D. Const. art. XII, § 13 ("Railways ... are hereby declared public highways, and all railroad[s] ... are declared to be common carriers and subject to legislative control; ..."); art. XII, § 5 ("the exercise of the police power of this state shall never be abridged, or so construed as to permit corporations to conduct their business in such a manner as to infringe the equal rights of individuals or the general well-being of the state").[6] In *Wabash Ry. Co. v. South Da-*

5. In NDCC 61–16.1–01, the Legislature recognizes and declares that the general welfare and the protection of the lives, health, property, and the rights of all people of this state require ... the management, conservation, protection, development, and control of water resources and for the prevention of flood damage in the watersheds of this state ... thereby to protect and promote the health, safety, and general welfare of the people of this state.

Many opinions, state and federal, have described a state's police power. *State v. Taylor,* 33 N.D. 76, 156 N.W. 561, 579 (1916); *Bratberg v. Advance–Rumely Thresher Co.,* 61 N.D. 452, 238 N.W. 552, 567 (1931); *State ex rel. City of Minot v. Gronna,* 79 N.D. 673, 59 N.W.2d 514, 531 (1953). Illustrative federal opinions include: *St. Louis and San Francisco Ry. Co. v. Mathews,* 165 U.S. 1, 23, 17 S.Ct. 243, 251, 41 L.Ed. 611 (1897); *Erie R.R. Co. v. Williams,* 233 U.S. 685, 700, 34 S.Ct. 761, 764–65, 58 L.Ed. 1155 (1914). *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979), has a particularly pertinent description:

[G]overnment regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922); *see Penn Central, supra,* 438 U.S., at 124, 98 S.Ct., at 2659. The Takings Clause, therefore, preserves governmental power to regulate, subject only to the dictates of " 'justice and fairness.' " *Ibid.;* 438 U.S. at 2659, 98 S.Ct., at 2659; *see Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct.

987, 990, 8 L.Ed.2d 130 (1962). There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. *See Penn Central, supra,* 438 U.S., at 123–128, 98 S.Ct., at 2659–2662. Resolution of each case, however, ultimately calls as much for the exercise of judgment as for the application of logic. As this opinion discusses, there are solid precedents for railroads being required to accommodate public drains.

6. N.D. Const. art. XII, § 5 was originally adopted in 1889 as N.D. Const. art. VII, § 134. The source of that language, reserving state police power over corporations, cannot be traced with certainty, but North Dakota probably took it from an 1885 proposed constitution for South Dakota. The entire corporations article from the 1885 South Dakota proposal was adopted by South Dakota in 1889 and has remained virtually unchanged. S.D. Const. art. XVII.

The 1885 draft constitution for South Dakota and a constitutional draft known as the Williams Constitution, or File 106, were the only two complete draft constitutions considered by the 1889 North Dakota Constitutional Convention. Robert Vogel, *Sources of the 1889 North Dakota Constitution,* 65 N.D.L.Rev. 331, 332 and n. 6 (1989) *(Sources). See also* Herbert L. Meschke and Lawrence D. Spears, *Digging for Roots: The North Dakota Constitution and the Thayer Correspondence,* 65 N.D.L.Rev. 343 (1989). The 1885 draft constitution for South Dakota was not formally introduced at the North Dakota Constitutional Convention, but copies of *Long's Legislative Hand Book,* containing that proposal, were distributed to all members of the Convention. *Journal of the Constitutional Convention for North Dakota* 114 (1889) *(Journal).* Much of the North Dakota Constitution was molded from sub-

*viess County Drainage Dist.,* 12 F.2d 909, the federal court for this circuit held that a Missouri railroad was not entitled to damages for the costs of a bridge across a new artificial waterway created by a lateral diversion ditch from a creek to the main drainage channel. The circuit court relied on the Missouri Constitution of 1875, art. 12, § 5, a constitutional clause virtually identical to the present art. XII, § 5 (quoted above) of the North Dakota Constitution, reserving state police power over corporations.[7]

Any doctrinal turmoil in the United States Supreme Court about regulatory takings has not reached anything like the subject of police-power regulation of railroads. Indeed, the Supreme Court recently acknowledged that it " 'has generally "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action" ' must be deemed a compensable taking." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (citations omitted). *Monsanto* was an impor-

tant precedent that we studied in *Northern States Power v. N.D. Pub. Serv. Comm'n,* 502 N.W.2d 240 (N.D.1993) (*N.S.P.*). In *Monsanto,* the Supreme Court held that "to the extent that Monsanto, an applicant for registration of pesticides [by the Environmental Protection Agency], had a confidential economic interest in its health, safety, and environmental data that was cognizable as a property right in a trade secret under state law, that property right was protected by the Taking Clause of the Fifth Amendment to the United States Constitution." *N.S.P.* at 245. There, the Supreme Court in *Monsanto,* 467 U.S. at 1005, 104 S.Ct. at 2874 (citation omitted), used an analysis that balanced three factors to determine whether a regulation under the police power created a taking: " 'the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations.' "

The *Monsanto* opinion distinguished between different statutory patterns that regulated registration of pesticides at different

missions, labeled as Files in numerical order as introduced, without designations of origin. *Journal* generally. The article on corporations was introduced to the Convention as File 4 by delegate Martin N. Johnson, and was identical to that found in the 1885 draft of the South Dakota Constitution. *Journal* at 21–22; T.K. Long, *Long's Legislative Hand Book* 38–41 (1889). Coincidentally, as the *Journal* discloses at 19, File 4 was introduced on July 13, 1889, the same day that a visiting commission of South Dakota delegates was given the privilege of the floor at the North Dakota Convention.

In North Dakota, File 4 was amended with minor changes, reintroduced as Files 134 and 135. File 134 (with minor variations taken from

135) was adopted in 1889 as article VII, and has remained substantially similar with only minor amendments and renumbering. *Journal* at 399–400; N.D. Const. of 1889, art. VII; N.D. Const. art. XII. Since no other complete state constitutions are known to have been considered by the Convention, and since the language of the corporations article introduced was identical to that in the 1885 South Dakota draft, we believe that the language in North Dakota's Constitution, reserving state police power over corporations, was taken directly from the 1885 South Dakota draft. We have not chronicled the origin of the corporations article in the 1885 South Dakota proposal.

7.  The clause on the reservation of state police power over corporations is not unique to North Dakota. Indeed, there are at least eleven states that had (and seven that still have) like language:

| State | article | date | status |
|---|---|---|---|
| Illinois | Art. XI, § 14 | 1870 | repealed 1970 |
| Pennsylvania | Art. XVI, § 3 | 1873 | repealed 1966 |
| Missouri | Art. XII, § 5 | 1875 | Art. XI, § 3 |
| Colorado | Art. XV, § 8 | 1876 | Art. XV, § 8 |
| California | Art XII, § 8 | 1879 | repealed 1972 |
| Idaho | Art. XI, § 8 | 1889 | Art. XI, § 8 |
| Montana | Art. XV, § 9 | 1889 | repealed 1972 |
| North Dakota | Art. VII, § 134 | 1889 | Art. XII, § 5 |
| South Dakota | Art. XVII, § 4 | 1889 | Art. XVII, § 4 |
| Mississippi | Art. 7, § 190 | 1890 | Art. 7, § 190 |
| Kentucky | § 195 | 1891 | § 195 |

times. *Id.* After 1978 congressional amendments, which established the data-disclosure mechanisms attacked as takings, had put Monsanto "on notice of the manner in which EPA was authorized to use and disclose any data turned over to it by an applicant for registration," Monsanto "could not have had a reasonable, investment-backed expectation that EPA would keep the data confidential beyond the limits prescribed in the amended statute itself." 467 U.S. at 1006, 104 S.Ct. at 2874. Only while earlier congressional enactments "had explicitly guaranteed to Monsanto . . . an extensive measure of confidentiality and exclusive use" would EPA's disclosure of Monsanto's trade secrets effect a taking. *Id.* at 1011, 104 S.Ct. at 2877.

Monsanto could not successfully challenge "the ability of the Federal Government to regulate the marketing and use of pesticides," because "such [police-power] restrictions are the burdens we all must bear in exchange for ' "the advantage of living and doing business in a civilized community." ' " *Id.* at 1007, 104 S.Ct. at 2874 (citations and footnotes omitted). In this drainage case, over a century of constitutional and legislative regulation of railroads under the state police power is one of the burdens that the railroads must bear in exchange for doing business in a civilized context. This enduring regulation, having controlled the railroad's conduct for so long, defeats any investment-based expectation that would transform the railroad's established duty to accommodate drainage improvements into a compensable taking.

Similarly, in *N.S.P.,* we employed the *Monsanto* regulatory-taking analysis to examine NSP's claim that its trade secrets were being unconstitutionally taken by disclosure laws long applicable to a public utility: "[A]s long as NSP is aware of the open-records law under which its contracts are filed with the PSC, and the filing requirement is rationally related to the legitimate state purpose of public utility regulation, 'a voluntary submission of data by [a public utility] in exchange for the economic advantages of [regulation] can hardly be called a taking.' " *N.S.P.,* 502 N.W.2d at 247. While this parallel may not be complete, BN Railroad's obligation to adjust its bridges across this public drain, under a long-standing regulatory pattern that imposes the costs of accommodating the public's need for drainage improvements on the railroad itself, can hardly become a taking when the public reasonably requires the change.[8]

Other recent precedents do not reflect any significant shift in this genre of regulatory-taking analyses. *See Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (Comprehensive program to preserve historic landmarks by prohibiting new construction did not effect a taking requiring compensation); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (Regulation under Pennsylvania's Bituminous Mine Subsidence and Land Conservation Act that required 50% of the coal beneath certain areas to be kept in place to provide surface support did not constitute a taking of private property without just compensation in violation of Fifth and Fourteenth Amendments.). The 1987 *Keystone* decision effectively weakens the precedential value of *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), sometimes cited as a landmark in modern regulatory-taking doctrine. *See also Grand Forks–Traill Water Users, Inc. v. Hjelle,* 413 N.W.2d 344 (N.D.1987), *appeal*

---

8. BN Railroad agrees that it should do the work of accommodating its tracks and bridges to these drainage improvements, and contests only bearing the costs:

This requirement that the railroad do the work is both reasonable and understandable. Work on and near railroad tracks is specialized and dangerous. It is work that a water resource district and most contractors are not skilled and equipped to handle. Railroads also have contracts with organized labor that require that railroads either perform the work on railroad property or the railroad will have to pay its laborers no matter who does the work, notwithstanding the fact the laborers did nothing on the site.

BN Railroad's Brief, p. 8, n. 3 (part). The reasonable needs of the railroad to do its own work in accommodating drainage improvements, largely for safety reasons, is alone enough reason for the State to exercise its police power to impose the costs of accommodation on the railroad.

*dismissed* 484 U.S. 1053, 108 S.Ct. 1002, 98 L.Ed.2d 969 (1988) (no regulatory taking where statutes required a utility to move, at its own expense, its water lines installed within a fixed distance of the center line of a highway, although not within the highway right-of-way, when the highway was later widened).

Nor do the most recent decisions of the United States Supreme Court change the constitutional analysis for legislated police-power regulation. *See Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (agency could not, without paying compensation, condition grant of permission to rebuild larger home on beachfront lot upon owner's transfer to public of an easement for lateral access across beach between two public beaches); *Dolan v. City of Tigard,* —— U.S. ——, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (approving floodplain zoning as a condition of an adjacent non-floodplain building permit for an individual owner, but rejecting conditions requiring dedication of the zoned greenway to public use for a storm drainage system, and dedication of an adjacent 15–foot strip as a pedestrian/bicycle pathway, as unconstitutional without individualized determinations of the reasonable relationship of the dedications to the legitimate public purposes of flood control and reduction of traffic congestion). *Dolan* explained:

> A land use regulation does not effect a taking if it "substantially advance[s] legitimate state interests" and does not "den[y] an owner economically viable use of his land."

The sort of land use regulations discussed in the cases just cited, however, differ in two relevant particulars from the present case. First, they involved essentially legislative determinations classifying entire areas of the city, whereas here the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. Second, the conditions imposed were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city.

—— U.S. at ——, 114 S.Ct. at 2316 (citations omitted). BN Railroad's duty in this case arises not from a municipal "adjudicative decision to condition," but rather from an express and general legislated duty under a constitutional reservation of police power over a corporation. NDCC 61–16.1–42 substantially advances a legitimate state interest in drainage and does not deny the railroad economically viable use of its track.

We conclude that NDCC 61–16.1–42 constitutionally places upon BN Railroad the continuing responsibility for the costs of accommodating its track to necessary drainage improvements. Therefore, we affirm.

LEVINE and NEUMANN, JJ., concur.

VANDE WALLE, Chief Justice, concurring in result.

I recognize that Justice Sandstrom's dissent may be prescient, but it is unclear to me what measure the trial court would use to determine if costs are to be allocated and, more specifically, how the allocations of those costs would be made.

If we were to analogize to special assessments for improvements, such as for cities as set forth in section 40–23–07, NDCC, with the construction placed on that procedure through the many court decisions, the duty of the trial court might be clearer. However, I do not agree that is the proper analogy. The special assessment analogy would subsume section 61–16.1–42, NDCC, in that the railroad would contend that the enlarging of the channel would not benefit the railroad property and could result in a determination of no benefit to the railroad and no payment by the railroad contrary to the majority's construction of section 61–16.1–42, NDCC, a construction with which I agree.

There is no doubt that North Dakota has historically considered railroads separate and apart from ordinary corporations. *See, e.g.,* Article XII, § 11–14, N.D. Const. *See also* Article XIII, § 1(2), N.D. Const. [compact with United States providing for distribution of taxes on railroad gross earnings between North Dakota and South Dakota].

The reason for separate treatment of railroads is their special status in the develop-

ment of our State. Railroads were instrumental if not integral to populating North Dakota. Because of this significance to settlement of the State, some railroads were given land grants by Congress for extending their rail lines through North Dakota, as well as other western states, and for the benefits resulting from that extension. Many of the benefits and many of the problems our State faces today, at least demographically, are due to the foresight or lack thereof, of the railroads.

In considering what is fair and reasonable, I suggest a factor for consideration would be whether or not the railroad received land grants in North Dakota from Congress to extend or build railroads in North Dakota and what, if any, benefits the railroads are currently providing to the area served by the enlargement of the channel.

However, unless there is clear direction from the United States Supreme Court as to what is meant by its statement in *Nashville, C. & St. L. Ry. v. Walters,* 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949 (1935) about "arbitrary and unreasonable imposition" of costs, *Walters,* 294 U.S. at 428, 55 S.Ct. at 494, and what factors are to be considered in determining whether an allocation of costs to the railroad is, as stated in the dissent, "fair and reasonable under all of the circumstances," I will adhere to the result reached by the majority. It is not apparent to me that *Walters* and its progeny which rely, at least in part, on the unfairness of requiring the railroad to improve a highway for the benefit of trucks, the competition for the railroad, applies in this case where competition is not a factor.

Finally, the majority's result retains the construction of section 61–16.1–42, NDCC, which the dissent agrees "places solely upon the railroad company the responsibility for payment of the costs of building and maintaining bridges and culverts where a drain intersects a railroad." I recognize that if a statute is susceptible of more than one construction, one that would make it of doubtful constitutionality and another that would not, we will adopt the construction which sustains its constitutionality. *E.g., Little v. Graff,* 507 N.W.2d 55 (N.D.1993). But, I am not con-

vinced that under *Walters* and its progeny, this statute, as applied to the facts of this case, is of doubtful constitutionality.

I concur in the result reached by the majority opinion.

SANDSTROM, Justice, dissenting.

Because I believe modern constitutional jurisprudence requires the trial court to determine whether the statutory allocation of 100 percent of the cost to BN Railroad was fair and reasonable under all of the circumstances, I respectfully dissent.

I agree with the majority that N.D.C.C. § 61–16.1–42 places solely upon the railroad company the responsibility for payment of the costs of building and maintaining bridges and culverts where a drain intersects a railroad. This was the prevailing attitude at the time its predecessor statute was enacted in the late 1800s. One author has noted in the analogous situation of railroad grade crossing cases that it had "been almost the universal rule to charge the costs of the grade separation to the railroad." J. Sax, *Takings and the Police Power,* 74 Yale L.J. 36, 70 (1964) (footnote omitted). *See also* Annot., *Constitutional power to compel railroad company to relocate or reconstruct highway crossing or to pay or contribute to expense thereof,* 109 A.L.R. 768, 769 (1937).

In *City of Winston–Salem v. Southern Railway Co.,* 248 N.C. 637, 105 S.E.2d 37, 47 (1958), the North Carolina Supreme Court explained the historical policy behind governmental entities requiring railroads to shoulder the expense of improvements to grade crossings:

"[D]uring the earlier days of railroading, before the development of our present State and Federal systems of improved highways, when vehicular traffic operated within short distance limits and served as important feeders for the railroad companies, the railroads shared substantially with the general public in the benefits of improved crossing facilities, in that the improved facilities tended to speed up the movement of vehicular traffic as feeders for the rails. Moreover, since practically all common carrier freight and passenger

traffic moved by rail, the costs of these crossing improvements, under sanction of the regulatory agencies, were built in to the rate structures and were passed on, first to the shipping public, and then to the ultimate consumers of the products moving by rail. And since these built-in costs were susceptible of being passed on to the ultimate consumers so effectively, the imposition upon the railroad companies of the financial burdens of making crossing improvements comported entirely with basic principles of fairness, and were conceived to impose no undue burdens upon the railroad companies."

See also Metro. Sewerage Dist. v. Chicago, M., St. P. & P. R. Co., 69 Wis.2d 387, 230 N.W.2d 651, 662 (1975); Comment, Constitutionality of Assessment upon Railroad for Underpass on Interstate, Federal–Aid Highway, 44 Yale L.J. 1259, 1260–1261 (1935).

I have serious doubts, however, about the constitutionality of the statute as construed by the majority.

The District principally relies on three decisions to support its argument that no compensable taking would occur by construing N.D.C.C. § 61–16.1–42 to require BN Railroad to pay the total cost for the bridges and culverts—City of Grafton v. St. Paul, M. & M. Ry. Co., 16 N.D. 313, 113 N.W. 598 (1907); Lake Shore & Michigan S.R. Co. v. Clough, 242 U.S. 375, 37 S.Ct. 144, 61 L.Ed. 374 (1917); and Chicago, B. & Q. R. Co. v. Illinois ex rel. Grimwood, 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596 (1906)—each discussed in the majority opinion. These cases clearly stand for the proposition that governmental action requiring a railroad to make structural changes where its lines intersect a watercourse or a public highway is merely incidental to the police powers of the state and never constitutes a compensable taking. The law is succinctly summarized in Grimwood, where the Supreme Court likened the rights of the public in the creek to the rights of the public in a public highway, and relied on several earlier state and federal court decisions addressing a railroad company's duty when a railroad track crosses a public highway.

" '[W]here there is a natural water way, or where a highway already exists and is crossed by a railroad company under its general license to build a railroad, and without any specific grant by the legislative authority to obstruct the highway or water way, the railroad company is bound to make and keep its crossing, at its own expense, in such condition as shall meet all the reasonable requirements of the public as the changed conditions and increased use may demand.' "

Grimwood, 200 U.S. at 587, 26 S.Ct. at 347 (quoting Chicago, B. & Q. R. Co. v. People ex rel. Grimwood, 212 Ill. 103, 72 N.E. 219, 223 (1904)).

Although Grafton, Lake Shore, and Grimwood have not been explicitly overruled, their precedential value has been limited by more recent developments in this area of taking jurisprudence.

Commentators have suggested the "Supreme Court's decisions in 'taking' issues may properly be viewed as a 'crazy quilt pattern' of rulings." 2 Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure, 2nd § 15.12(a), at p. 490 (1992) (quoting Dunham, Griggs v. Alleghenny County in Perspective: Thirty Years of Supreme Court Expropriation Law, 1962 Sup.Ct.Rev. 63, 63). Because of the various contexts in which a taking issue may arise, cases resolving responsibility for payment for structural changes where railroads intersect roads, highways or watercourses have formed a separate category of their own. See J. Sax, Takings and the Police Power, 74 Yale L.J. 36, 70 (1964).

Lake Shore, Grimwood, and Grafton, which relied on the Supreme Court's decision in C.B. & Q. Ry. Co. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897), were decided in 1917, 1906, and 1907, respectively. Grimwood and C.B. & Q. Ry. Co. v. Chicago were authored by Justice Harlan and these cases, along with Lake Shore, clearly illustrate Justice Harlan's view that "taking differed qualitatively from regulation and, therefore, mere use regulation never necessitated compensation by the state." 2 Rotunda & Nowak, at p. 488. But as evidenced by the landmark 1922 Supreme Court decision in

*Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), Justice Holmes, the leading exponent of a broader test of compensability based on "fairness," viewed "the distinction between taking and regulation as one of degree," and "if regulation reached a certain extreme, it became a 'taking', though no property was actually taken in a literal sense." 2 Rotunda & Nowak, at p. 489.

This shift in the Supreme Court's view of taking issues is illustrated in the category of railroad grade crossing cases by *Nashville, C. & St. L. Ry. v. Walters,* 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949 (1935). In *Walters,* a statute authorized the state highway commission, whenever a state highway crossed a railroad, to require the separation of grades if in its discretion the action was necessary for the protection of travelers, and, without conferring on the commission any discretion as to the proportion of the cost to be borne by the railroad, required the railroad to pay one-half of the total cost in every case. Under the statute, the commission ordered the railroad to construct an underpass to separate grades where a proposed state highway would cross its track and to bear one-half of the cost. The railroad did not dispute the need for the project, but asserted the statute's requirement it bear one-half of the cost, under the circumstances, was "so arbitrary and unreasonable as to deprive it of property without due process of law. . . ." *Walters,* 294 U.S. at 413, 55 S.Ct. at 487.

The Supreme Court began by noting "in Tennessee, as elsewhere, the rule has long been settled that, ordinarily, the state may, under its police power, impose upon a railroad the whole cost of eliminating a grade crossing, or such part thereof, as it deems appropriate." *Walters* (footnote omitted). The Court cited its earlier watercourse decisions in *Grimwood* and *Lake Shore* as comparable authority for this proposition.

The Court further noted a statute valid as to one set of facts may be invalid as to another, a statute valid when enacted may become invalid by a change of conditions to which it is applied, and the police power is subject to the constitutional limitation that it may not be exerted arbitrarily or unreason-

ably. *Walters* 294 U.S. at 414–15, 55 S.Ct. at 488. The Court stressed the revolutionary changes in recent years brought about by the widespread introduction of motor vehicles which seriously decreased rail traffic and revenues through increased competition for both freight and passenger traffic. The Court ruled the state court had erred "in refusing to consider whether the facts relied upon by the railway established as arbitrary and unreasonable the imposition upon it of one-half the cost of the underpass." *Walters* at 428, 55 S.Ct. at 494. The Court said the "promotion of public convenience will not justify requiring of a railroad, any more than of others, the expenditure of money, unless it can be shown that a duty to provide the particular convenience rests upon it," and "when particular individuals are singled out to bear the cost of advancing the public convenience, that imposition must bear some reasonable relation to the evils to be eradicated or the advantages to be secured." *Walters* at 427–28, 429, 55 S.Ct. at 494, 495.

The state court had held the statute apportioning one-half of the cost to the railroad valid on its face. The Supreme Court did not rule the statute unconstitutional, but sent the case back to the state court to determine whether the statutory allocation of 50 percent of the cost to the railroad was arbitrary and unreasonable under the circumstances. *Walters* at 431–32, 433–34, 55 S.Ct. at 496, 497.

As reflected by *Walters,* the change in judicial attitude toward the railroad's responsibility for payment is partly attributable to the practical consideration of increased competition from other forms of transportation. After discussing the early days of railroading during which practically all common carrier freight and passenger traffic moved by rail, the court in *City of Winston–Salem v. Southern Railway Co.,* 248 N.C. 637, 105 S.E.2d 37, 47–48 (1958), explained:

"But conditions have changed. . . .

"Under the ordinary competitive conditions now prevailing between the rails and motor transport where, as here, the railroad company derives no direct benefit from the proposed crossing improvement, the imposition on the company of the costs

of the project may not ordinarily be justified to any degree on the theory that the costs will be absorbed in the rate structure and passed on to the general public. This is so because rail rates, like other competitive price structures, are subject now in a real sense to the economic law of diminishing returns. And by reason of prevailing conditions under which the rails are in a losing competitive fight for business with other modes of transportation, the costs of crossing improvements may not be built into the rate structures and passed on effectively to the shipping public as in former times. Besides, and assuming *arguendo* that the costs of these improvements might still in some instances be absorbed in railroad rate structures and passed on to the ultimate consumers, even so, there would be an element of basic unfairness in such process where, as here, the company stands to receive no direct benefit from the project, since the costs would fall only on consumers of goods and on passengers moving by rail, in exoneration of the vast volume of commodities and passengers moving by motor and other competitive modes of transportation."

*Walters* was reaffirmed in *Atchison, T. & S.F. Ry. Co. v. Public Util. Commission,* 346 U.S. 346, 74 S.Ct. 92, 98 L.Ed. 51 (1953). In *Atchison,* the state public utilities commission entered orders, after considering all facts and evidence given by the railroads, requiring them to either enlarge or construct underpasses at grade crossings and allocating 50 percent of the cost of each project to the railroads. The railroads appealed, arguing the costs should be allocated on the basis of benefits alone, and since the railroads would receive little or no benefits, they should be required to pay only a small part of the costs or nothing at all. The Court affirmed the commission's discretionary allocation of 50 percent of the costs to the railroad, reasoning:

"[T]he improvements were instituted by the State or its subdivisions to meet local transportation needs and further safety and convenience, made necessary by the rapid growth of the communities. In such circumstances, this Court has consistently held that in the exercise of the police power, the cost of such improvements *may be* allocated all to the railroads.... There is the proper limitation that such allocation of costs must be fair and reasonable. *Nashville, C. & St. L. Ry. v. Walters,* 294 U.S. 405, 415, 55 S.Ct. 486, 488, 79 L.Ed. 949, and the cases there cited. This was the standard applied by the Commission. It was not an arbitrary exercise of power by the Commission to refuse to allocate costs on the basis of benefits alone. The railroad tracks are in the streets not as a matter of right but by permission from the State or its subdivisions. The presence of these tracks in the streets creates the burden of constructing grade separations in the interest of public safety and convenience. Having brought about the problem, the railroads are in no position to complain because their share in the cost of alleviating it is not based solely on the special benefits accruing to them from the improvements."

*Atchison,* 346 U.S. at 352–53, 74 S.Ct. at 96 (emphasis in original; citations omitted).

In this category of taking cases,[1] *Walters* and its progeny have been viewed as "highlighting an evolutionary shift by both courts and legislatures away from mechanical application" of the Court's earlier decisions. *Southern Railway Company v. City of Morristown,* 448 F.2d 288, 290 (6th Cir.1971), *cert. denied,* 405 U.S. 922, 92 S.Ct. 958, 30 L.Ed.2d 792 (1972). *Walters* and *Atchison* were grade crossing cases rather than watercourse cases. Nevertheless, because the Supreme Court relied on grade crossing cases to support its decision in *Grimwood,* and cited *Grimwood* and *Lake Shore* as authority for the general rule of railroad liability that it

1. *Atchison* and *Walters* were most recently cited by the United States Supreme Court as examples of taking challenges by the majority and minority opinions in *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 126, 148, 98 S.Ct. 2646, 2660, 2671, 57 L.Ed.2d 631 (1978), where the

majority held the city's landmark preservation ordinance which placed certain restrictions on the use of designated property did not constitute a taking or otherwise require exercise of the eminent domain power.

altered in *Walters,* I discern no legal basis for distinguishing between the two types of cases in analyzing a taking challenge. *Walters* and *Atchison* present the proper framework for analysis in this case.

These cases comport with more recent decisions of this Court which have refused to mechanically adhere to "the rule of noncompensation normally applicable to police-power regulations." *Buegel v. City of Grand Forks,* 475 N.W.2d 133, 136 (N.D.1991) (noting exceptions to rule of no compensation). *See also Minch v. City of Fargo,* 297 N.W.2d 785, 790 (N.D.1980) ("Distinguishing between use of the police power and a compensable damaging may not be easy in certain cases.... [t]he extent of the owner's loss is inevitably a factor in any attempt to identify an act as either a damaging or a police function."). They also comport with the recent reemergence by the United States Supreme Court of the principle " '[a] strong public desire to improve the public condition [will not] warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.' " *Dolan v. City of Tigard,* —— U.S. ——, ——, 114 S.Ct. 2309, 2322, 129 L.Ed.2d 304 (1994) (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922)). *See also Nollan v. California Coastal Commission,* 483 U.S. 825, 841–842, 107 S.Ct. 3141, 3151, 97 L.Ed.2d 677 (1987) ("California is free to advance its 'comprehensive program,' if it wishes, by using its power of eminent domain for this 'public purpose,' ...; but if it wants an easement across the Nollans' property, it must pay for it.").

The decision of the court in *City of Gainesville v. Southern Railway Company,* 423 F.2d 588 (5th Cir.1970), is particularly instructive. In *Gainesville,* an ordinance enacted by the city required the railroad to install and maintain entirely at its own expense automatic signaling devices where its main line intersected a city street. The trial court had found the requirement of installing the device was reasonable, but did not consider the reasonableness of the allocation to the railroad of responsibility for 100 percent of the cost. After discussing *Walters* and *Atchison,* the court said:

"Southern does not argue that the cost should be allocated according to benefit alone as was argued in *Atchison...*, but that there should be several considerations, equity, benefit, degree of danger caused by Southern, and what is generally, under comparable circumstances, considered to be reasonable by courts and governmental agencies. It is clear from *Atchison,* that these are proper considerations. The elements of reasonableness and fairness *in the allocation of costs* in addition to the reasonableness of the *requirement of installing* the signalling device itself must be considered by the court.

\*      \*      \*      \*      \*      \*

"We do not hold that a municipality or a state does not have full power to require a railroad company to bear all the cost for a grade crossing safety device, nor that the Gainesville ordinance is unconstitutional per se because it is an unreasonable and arbitrary exercise by the City of Gainesville of its police power, nor that benefit should be the sole measure of the allocation of cost. We find here that the district court did not make a finding as to the reasonableness of the *allocation of costs* in installing and maintaining the signal devices as to this particular case, a determination which might or might not make the application of the ordinance unconstitutional. Therefore, we conclude that we must remand the case to the district court for a determination as to the reasonableness under all of the circumstances, of the allocation of one hundred percent of the cost to Southern Railway."

*Gainesville* at 591 (emphasis in original). *See also Morristown; Atchison, T. & S.F. Ry. Co. v. Public Utilities Commission,* 190 Colo. 378, 547 P.2d 234, 236 (1976); *Southern Railway Company v. City of Knoxville,* 223 Tenn. 90, 442 S.W.2d 619, 623 (1968), *cert. denied,* 396 U.S. 1002, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970).

In this case, there is no dispute modifications to the drain and to the bridges and culverts are reasonable and necessary. The only dispute is over who must bear the responsibility for payment of the costs to construct the bridges and culverts. The trial

court ruled N.D.C.C. § 61–16.1–42 required BN Railroad to pay 100 percent of the cost, without further determining whether the statutory allocation of 100 percent of the cost to BN Railroad was fair and reasonable under all of the circumstances. Absent this finding, it is impossible to determine whether requiring BN Railroad to absorb the total cost would violate the Art. I, § 16, N.D. Const., prohibition of taking or damaging private property for public use without just compensation, thereby rendering N.D.C.C. § 61–16.1–42 unconstitutional as applied in this case.

I would reverse and remand to the trial court for a finding, after the parties are allowed to present evidence on the question, whether allocating 100 percent of the cost to BN Railroad is fair and reasonable under all of the circumstances. I would direct the trial court to consider several factors, including equity, benefit, degree of danger or problem caused by the railroad, and what is generally, under comparable circumstances, considered to be reasonable by courts and governmental agencies. *See Gainesville* at 591.

Instead, the majority summarily dismisses in a footnote *Walters* and *Atchison,* the most relevant line of authority in this category of taking cases; relies on taking cases that are in no way analogous to the factual situation before us; and reaches a result directly supported only by antiquated cases which, since 1935, can at best be described as "derelict[s] in the stream of the law." *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 167, 94 S.Ct. 407, 414, 38 L.Ed.2d 379 (1973).

I respectfully dissent.